Edwin A. JOSE, et al., Plaintiffs,

v.

M/V FIR GROVE, In Rem, et al., Defendants.

Civ. No. 90–6028–MA.

United States District Court, D. Oregon.

Oct. 11, 1990.

See also 765 F.Supp. 1024 and 765 F.Supp. 1037.

Richard J. Dodson, Thomas E. Richard, Law Offices of Richard J. Dodson, Baton Rouge, La., John Buehler, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for plaintiffs.

Paul Wonacott, Kathleen A. McKeon, Wood Tatum Mosser Brooke & Landis, Portland, Or., for defendants.

## OPINION

MARSH, District Judge.

Plaintiffs are fourteen foreign seamen who filed this action seeking to recover back wages and penalties pursuant to 46

U.S.C. § 10313 as well as compensatory and punitive damages for alleged fraudulent labor practices.[1] Defendants move for reconsideration of my previous order denying their motion for partial summary judgment regarding plaintiffs' ability to claim penalty wages under the U.S. Shipping Act. In addition, defendants move to dismiss plaintiffs' claims for "blacklisting" for lack of subject matter jurisdiction and move for partial summary judgment against plaintiffs' fraud claims. For the reasons that follow, defendants' motions are granted in part and denied in part.

## BACKGROUND

Plaintiffs are former crew members of the M/V FIR GROVE, employed by defendant Delica Shipping, S.A. (Delica) or defendant Inui Steamship Company, Ltd. (Inui), foreign shipping corporations. All plaintiffs are citizens of the Philippines. The Fir Grove is a vessel which flies the flag of the Republic of Vanatu.

In late 1988, and early 1989, plaintiffs were recruited by Western Shipping Agency, Inc., in Manilla, for service aboard the Fir Grove. While at the Western recruiting office, plaintiffs allege that they signed individual twelve month employment contracts in which the wage rates were left blank. Thereafter, on January 25, 1989, plaintiffs joined the Fir Grove in Japan. Plaintiffs allege that, upon joining the vessel, they were each given a copy of the shipping articles and a copy of the International Transport Workers' Federation Worldwide Collective Agreement ("ITF Agreement").

Between January 25, 1989, and early January of 1990, the Fir Grove completed six voyages. On each voyage, the vessel embarked from Japan for the United States where it loaded shipments of logs and sailed back to Japan where the logs were discharged.

Plaintiffs allege that throughout this period defendants engaged in a fraudulent scheme in which they issued two monthly wage receipts to plaintiffs: one for the amount of wages specified in the ITF wage scale and one receipt for wages actually paid. Plaintiffs assert that they were paid approximately 20 percent of wages owing under the ITF scale. Plaintiffs contend that they could not, however, complain or demand full wages for fear of immediate discharge.

On January 24, 1990, on its seventh voyage to the United States, the Fir Grove was arrested in Coos Bay, Oregon. The original twelve seamen plaintiffs asserted claims for back wages totalling $299,431.00 and for penalty wages of $2.46 million accrued to January 19, 1990.[2] On January 30, 1990, defendants tendered $299,431.00 in back wages to the original twelve plaintiffs. On February 2, 1990, plaintiffs were discharged in Coos Bay, Oregon, and repatriated shortly thereafter.

On February 7, 1990, two additional seamen, Asher Nianga and Virgilio Torriliza were added to the complaint. On February 14, 1990, defendants tendered $50,308.60 in satisfaction of their claims for back wages.

In addition, plaintiffs claim that defendants "blacklisted" them and rendered them unemployable by noting in their seaman books that they were "disabled from future employment," whiting out this notation, then noting that they were "repatriated at the seaman's request." Plaintiffs argue that these notations and corrections have disabled them from future employment. They seek compensatory damages for loss of future income, $250,000 each in emotional distress damages and $3 million each in punitive damages.

## DISCUSSION

### 1. *Motion for Reconsideration*

Defendants move for reconsideration of my previous denial of their motion

---

1. In addition, plaintiff Edwin Jose and his wife, Augustine Jose, seek to recover damages for a maritime personal injury under the Jones Act, 46 U.S.C.App. § 688 and general maritime law of the United States.

2. The "original twelve" seamen plaintiffs include: Edwin Jose, Orlando Osorio, Ascencion Conejar, Romulo Mejarito, Clemente Pagaduan, Antero Daug, Nicholas Coyoca, Carmelo Pagent, Danilo Penetrante, Alberto Dagtcuta, Basilio Santos and Goven Calibjo.

for partial summary judgment on the basis that plaintiffs may not recover penalty wages under 46 U.S.C. § 10313(f)(g)(i). The United States Shipping Act, 46 U.S.C. § 10313, provides in relevant part:

(a) A seaman's entitlement to wages and provisions begins when the seaman begins work or when specified in the agreement required by section 10302 of this title for the seaman to begin work or be present on board, whichever is earlier.

\* \* \* \* \* \*

(e) After the beginning of the voyage, a seaman is entitled to receive from the master, on demand, one-half of the balance of wages earned and unpaid at each port at which the vessel loads or delivers cargo during the voyage.... If a master does not comply with this subsection, the seaman is released from the agreement and is entitled to payment of all wages earned ...

(f) At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.

(g) When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

\* \* \* \* \* \*

(i) This section applies to a seaman on a foreign vessel when in a harbor of the United States. The courts are available to the seaman for the enforcement of this section.

In *Su v. M/V SOUTHERN ASTER,* 1990 A.M.C. 1217 (1990), I found that the statute's language contained in subsection (f) which, read together with subsection (i), requires an actual *discharge* of cargo or seamen in a U.S. port as a jurisdictional prerequisite to recovery of a wage penalty. At 1218–22. In analyzing the issue with a minimum contacts-type inquiry, I drew the line at the point where foreign seamen were actually discharged in a U.S. port.

Defendants argue that subsection (f) of § 10313 not only requires that plaintiffs be discharged in a U.S. port, but that their discharge must also coincide with the "end of the voyage" as defined by the shipping articles. They also re-urge their previous argument that an alleged failure to pay *full* wages on a monthly basis cannot trigger statutory penalties in the absence of a discharge at the end of a voyage.

In my previous opinion I concluded that plaintiffs' claims met the jurisdictional prerequisites as set forth in § 10313(f), (g) and (i) based upon plaintiffs' assertion that they were not paid full monthly wages as required by the shipping articles, the Fir Grove's extensive contacts with the U.S., and that thirteen plaintiffs were, in fact, discharged in a U.S. port.

Although there is no clear legislative history indicating that Congress ever intended that § 10313 could be applied to claims of partial payments made over the course of a year, rather than full payment at the end of a one-year term, I find that the language of the statute is broad enough to encompass such a claim. Referring back to subsection (a) of § 10313, I find that the terms of the shipping articles and the mode of payment agreed upon by the parties are relevant to plaintiffs' statutory claims. Where the parties have agreed to monthly payments, rather than a lump sum upon discharge, I conclude that plaintiffs may seek penalties on the amounts allegedly due for previous months. However, whether plaintiffs are entitled to recover penalties under the facts present in this case has yet to be decided. As I noted in my previous opinion, genuine issues of material fact exist as to whether defendants' delay in making full payment was "without sufficient cause" as provided by § 10313(g). In addition, evidence introduced in support of the most recent series of motions indicates that genuine issues exist as to the actual terms of plaintiffs' employment contracts and the amount of wages owing.

Accordingly, my previous ruling stands.

### 2. Motion to Dismiss "Blacklisting" Claims

#### a. Federal Subject Matter Jurisdiction

■ Defendants move to dismiss plaintiffs' "blacklisting" claims on the ground that interference with prospective business relations is not a maritime tort, and thus, this court lacks subject matter jurisdiction to hear the claims.

Plaintiffs tort claims do not arise under the laws of the United States, nor is diversity of citizenship present. Hence, admiralty is the sole basis of federal subject matter jurisdiction upon which plaintiffs claims may rest. The scope of admiralty jurisdiction is defined by 28 U.S.C. § 1333(1) which provides as follows:

> "The district courts shall have original jurisdiction, exclusive of the courts of the States, of any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are entitled."

For decades, the existence of admiralty jurisdiction was defined by a simple and straightforward "locality" test. If the incident occurred on or in navigable waters, then admiralty jurisdiction was found to exist. *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 253–54, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972). However, courts began to experience increasing difficulty with the application of a strict locality test where the connection to navigable waters was fortuitous, such as a plane crash, or conversely, where the injury occurred on a dock near a ship but in relation to a traditional maritime activity such as cargo loading. *Id.* at 259–61, 93 S.Ct. at 500–01.

With the pragmatic difficulties of a strict locality test in mind, the Supreme Court sought to remedy the harshness of the rule by creating a second prong to the test. In *Executive Jet,* the Supreme Court found that plaintiffs' claims for wrongful death due to a plane crash in Lake Erie did not give rise to admiralty jurisdiction. The Court held that strict application of the locality test no longer made sense and that plaintiffs must also demonstrate that their claims involved a "significant relationship to traditional maritime activity." *Id.* at 267–68, 93 S.Ct. at 504.

Following the Supreme Court's decision in *Executive Jet,* there has been a certain degree of confusion surrounding the application of the test for admiralty jurisdiction and whether the locality test has been supplanted or augmented by the "maritime nexus" test. Although there is dicta in *Executive Jet* that indicates that damage actions based upon events that occur near ships or around docks may be included within admiralty jurisdiction even though not literally taking place in navigable waters, the Ninth Circuit has subsequently and consistently applied a two-prong test, in which both the locus and nexus elements must be met. In *Guidry v. Durkin,* 834 F.2d 1465 (9th Cir.1987) the court explained:

> "In this circuit, following *Executive Jet,* a claim falls within the federal court's admiralty jurisdiction if the actions complained of have (1) a maritime "situs"—a tort on or over navigable waters, and (2) a maritime "nexus"—a significant relationship to traditional maritime activity."

*Id.* at 1469 (emphasis added) (*citing Solano v. Beilby,* 761 F.2d 1369, 1370 (9th Cir. 1985)). *See also East River Steamship Co. v. Transamerica Delaval,* 476 U.S. 858, 864, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986) (Court "added" requirement that tort involve traditional maritime relationship); *Simon v. Intercontinental Transport B.V.,* 882 F.2d 1435, 1440 (9th Cir. 1989) (claim for bad faith breach of a contractual duty fails admiralty jurisdiction test where tort occurred on land).

In *Guidry,* plaintiff was a civilian employed by the Department of the Navy as an engine utilityman. After his assignment, but prior to his arrival on board, the Chief Engineer wired back to base requesting that someone other than plaintiff be assigned to his ship who was capable of working "without constant supervision." Plaintiff brought a claim against the Chief Engineer for the intentional tort of libel and general negligence. Applying the two prong test, the court held that the locus test was met because all of the *prima facie*

elements of libel had taken place at sea. *Id.* at 1470. The court then determined that the "nexus" test was met because the message was drafted "in furtherance of engine room operations." *Id.* at 1469.

The importance of the Ninth Circuit's adherence to the locus test is further underscored by a comparison with a case which preceded *Guidry*. In *LaMontagne v. Craig*, 817 F.2d 556 (9th Cir.1987) the plaintiff seaman brought a similar action for defamation alleging that he had lost a promotion due to a letter of reprimand that was sent from the ship to the company's office in Hong Kong. The court held that since the publication of the letter did not take place until it reached Hong Kong, and because the harm regarding the promotion decision occurred on land, the district court lacked subject matter jurisdiction to hear the claim. *See also Solano*, 761 F.2d at 1371 (locus test applies to injury on ramp of ship, although concept of "locus" expanded).

Further, in applying the locus test, the Ninth Circuit focusses on the sight of the consummation of the injury rather than where the negligent act or omission takes place. *Solano*, 761 F.2d at 1372; *see also Clinton v. Joshua Hendy*, 285 F.2d 199 (9th Cir.1960) (plaintiff expelled due to libellous letter sent to Union Hall failed to state claim in admiralty because injury consummated on land); *Clinton v. Int'l Org. of Masters, Mates & Pilots*, 254 F.2d 370 (9th Cir.1958) (dismissal of action against Union for breach of by-laws since tort not committed on navigable waters).

Plaintiffs argue that, since their claims for blacklisting relate to "traditional maritime activity," admiralty jurisdiction exists under *Executive Jet* and a series of cases from the First Circuit.[3] *See Pino v. Protection Maritime Insurance Company*, 599 F.2d 10 (1st Cir.), *cert. denied* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) and *Carroll v. Protection Maritime Insurance Co.*, 512 F.2d 4 (1st Cir.1975) (claims that insurance company interfered with employment fall within admiralty jurisdiction regardless of whether tort arose on land or sea).

■ I find that the law, at least as it exists within the Ninth Circuit, clearly requires that both the maritime locus and nexus elements must be met. Although defendants concede that the notations in plaintiffs' seamen books occurred on navigable waters, any harm they may have suffered as a result of that action has been on land with their attempts to seek future employment. Thus, even if plaintiffs' claims relate to a traditional maritime activity, the injury was not consummated at sea and the first prong of the Ninth Circuit's test for admiralty jurisdiction has not been met.[4]

Based on the foregoing, I conclude that plaintiffs have failed to state a claim that falls within the definition of a maritime injury. Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction is granted.

### b. Pendent Jurisdiction

■ Federal courts have pendent jurisdiction over non-federal claims between parties litigating over other matters properly before the court when federal and non-federal claims "derive from a common nucleus of operative fact" and plaintiff would expect to try them in one judicial proceeding. *Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989) (*citing United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). Courts have found a "common nucleus" to exist where

---

**3.** The Ninth Circuit has held that the following factors must be considered to determine whether the alleged activity satisfies the maritime nexus test: (1) traditional concepts of the role of admiralty law; (2) the function and role of the parties; (3) the types of vehicles and instrumentalities involved; (4) the causation and nature of the injury suffered. *Guidry*, 834 F.2d at 1471.

**4.** In addition, I find that plaintiffs' reliance on the Admiralty Extension Act, 46 U.S.C.App. § 740 (1948), is misplaced. The Act did not change the two-prong test enunciated in *Guidry*, but merely broadened the concept of "locality" to encompass ship-to-shore injuries and damages. *See Executive Jet*, 409 U.S. at 259–60, 93 S.Ct. at 500.

both state and federal claims derive from a single decision or transaction. *See Nishimoto v. Federman–Bachrach & Assoc.,* 903 F.2d 709, 715 (9th Cir.1990) (pendent jurisdiction properly exercised where state and federal claims both arose out of defendant's decision to terminate employment). The decision to exercise pendent jurisdiction is discretionary. *State of Nevada Employees Assoc., Inc. v. Keating,* 903 F.2d 1223, 1228 (9th Cir.1990).

Plaintiffs argue that their tort claims derive from a "common nucleus" of facts because the blacklisting occurred in retaliation against their filing this action to recover wages. I disagree. An allegation of "cause and effect" is not the equivalent of a common set of facts which would justify pendent jurisdiction and result in judicial economy. However, facts relevant to plaintiffs' federal claims that defendants underpaid them are also relevant to their pendent claims that defendants blacklisted them in retaliation for filing a lawsuit to recover alleged underpayments. In order to prove that defendants *intentionally* interfered with plaintiffs' future employment contracts, plaintiffs will necessarily have to produce evidence regarding defendants' alleged motivation to blacklist them which arises out of the wage dispute. In addition, evidence supporting defendants' motivation to "blacklist" plaintiffs will be necessary in order to determine the appropriateness of punitive damages.

Based on the foregoing, I conclude that a common nucleus of operative facts exists between plaintiffs' claims for back wages and their tort claims for future economic injury due to "blacklisting" such that plaintiffs would expect to try them in one judicial proceeding. Accordingly, defendants' motion to dismiss plaintiffs' blacklisting claims is denied as this court shall exercise pendent jurisdiction over those claims.

### 3. *Motion for Partial Summary Judgment: Fraud Claims*

Defendants move for partial summary judgment against plaintiffs' fraud claims on the basis that plaintiffs' deposition testimony establishes that: (1) no fraudulent misrepresentations were made to plaintiffs with respect to their rate of pay; and (2) none of the plaintiffs relied to his detriment on any representation related to payment of wages at ITF rates. For the reasons that follow, defendants' motion is granted.

### STANDARDS

Summary judgment is appropriate if the court finds that there is no genuine issue of material fact and the moving party is entitled to judgment as matter of law. Fed.R. Civ.P. 56(c). There is no genuine issue of material fact where the nonmoving party fails "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir.1989).

All reasonable doubts as to the existence of genuine issues of fact must be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valadingham v. Bojorquez,* 866 F.2d 1135, 1137 (9th Cir.1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Insurance Company of North America,* 638 F.2d 136, 140 (9th Cir.1981).

### DISCUSSION

Federal district courts sitting in admiralty apply the common law of fraud. *See e.g. Black–Gold Marine v. Jackson Marine,* 759 F.2d 466, 470 (5th Cir.1985). In order to establish actionable fraud, plaintiff must plead and prove the following elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *Wil-*

cox v. First Interstate Bank of Oregon, 815 F.2d 522, 531 n. 7 (9th Cir.1987); Webb v. Clark, 274 Or. 387, 391, 546 P.2d 1078 (1976).

■ Plaintiffs allege that they relied to their detriment on the representation of defendants and their agents that they would be paid according to ITF rate schedules. Defendants allege, and plaintiffs do not dispute, that plaintiffs signed the shipping articles in blank and that the wage provision in the shipping articles remained blank until January 21, 1990, when the reference to the ITF wage scale was written in.

■ A party cannot create issues of fact by submitting an affidavit which contradicts sworn testimony. Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1410 (9th Cir.1987). In Jurado, plaintiff alleged that he was terminated from his employment without having been given the opportunity to change his performance. However, in his earlier sworn affidavit, he had stated that he "refused to accede to management's demand." Id., at 1410. Accordingly, the Ninth Circuit held that plaintiff had failed to create a genuine issue of material fact regarding the reasons for his termination. See also Foster v. Arcata Assoc., Inc., 772 F.2d 1453, 1462–63 (9th Cir.1985), cert. denied, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986) (in opposing summary judgment, plaintiff could not claim she only expressed a preference for not working in Monterey after testifying at deposition that she conditioned employment on Monterey location); and Yamaha Corp. of America v. ABC Intern. Traders, 703 F.Supp. 1398, 1401–02 (C.D.Cal.1988) (where complaint contained allegation that defendant sold genuine Yamaha products, plaintiff could not create factual issues by contradicting pleadings).

In reviewing plaintiffs' deposition testimony, the single most striking feature is the consistency of their stories. Plaintiffs testified that when they were called for service by the manning agent in Manila,

they were orally informed that their wages would be between $115–$160 monthly shipboard pay and $220–$509 in monthly allotments (depending upon their position and experience) which would be sent to a designated family member. Each plaintiff confirmed that he had in fact received his anticipated wages:

"Q. Did you receive everything you expected to receive aboard the Fir Grove?

A. Yes, sir.

Q. Each month?

A. Yes, sir."

Deposition of Ascencion A. Conejar, p. 18; Deposition of Nicholas Coyoca, p. 34–36; Deposition of Rolando Osorio, p.16–17; Deposition of Asher Nianga, p. 8; Deposition of Romulo Mejarito, p. 10; Deposition of Alberto Dagcuta, p. 7–8.

Plaintiffs further testified that they were never told that they would receive pay under the ITF wage scale, but that they were given copies of the wage scale with the specific instruction from Chief Officer Lim that they were to present the scale to any ITF inspectors.[5] As Danilo Penetrante explained:

"[T]he document was given to us by Chief Officer Lim so that we can show it, we can present it to any ITF people. He said, present this, that this paper is a fake, this is not the actual salary we will receive."

Penetrante Deposition, p. 21.

Plaintiffs attempt to rebut this testimony by arguing that their depositions were taken under "stressful conditions" and by submitting affidavits which directly contradict their earlier sworn testimony. I find no indication in any of the depositions that any of the plaintiffs felt they were being forced to talk or were under stress of any kind. First, all plaintiffs were represented by local counsel and provided with an interpreter who was present during the duration of their testimony. Second, their testimony appears to be frank and straightforward. Most plaintiffs indicated that they

---

5. Plaintiff Asher Nianga testified that he was told to inform any ITF inspectors that he received a base salary of $611 per month without overtime. Penetrante was instructed to tell anyone from ITF that he earned $815 per month.

were no longer fearful of reprisals since they were off the boat and had received their checks for claimed back wages. The testimony of Romulo Mejarito is particularly instructive on this point. Mr. Mejarito testified that he had been afraid to complain or explain his involvement in the lawsuit earlier, because Chief Officer Lim was the godfather of one of his children and was also responsible for obtaining a promotion on the Fir Grove for him. However, Mejarito testified that now that he was off the boat, he no longer felt fearful and could tell his story truthfully.

Following their depositions, each plaintiff executed a sworn affidavit which states:

"I hearby swear and affirm that I knew I was legally entitled to the rate of pay specified for my position in the ITF Worldwide Collective Bargaining Agreement Pay Scale, a copy of which was provided to me upon boarding the vessel ... I continually anticipated receiving the rate of pay specified in the shipping articles and legally expecting it."

As discussed previously, plaintiffs may not rely upon contradictions in their sworn testimony to create genuine issues of material fact. I find that their identical, sworn affidavits are insufficient to rebut their earlier deposition testimony regarding the wages they were promised and received.

Based upon my review of plaintiffs' depositions, I find that there is overwhelming evidence that defendants were engaged in a scheme designed to avoid the terms of the ITF agreement. However, I also find that all of the evidence in the record indicates that plaintiffs were willing participants in this unfortunate scheme obviously designed to cut costs at the seamen's expense. However, as offensive and unethical as these alleged practices may seem, and although other remedies may be available, they may not be used to support a claim of common law fraud which is wholly inapplicable to willing co-conspirators. Although plaintiffs may view the elements of fraud as "hypertechnical" requirements, they are the legal guidelines that must direct my decision.[6]

Based upon the foregoing, I find that there are no genuine issues of material fact regarding plaintiffs' knowledge of the alleged fraudulent scheme, or their lack of reliance on any alleged contractual representation that they would receive wages in accordance with the ITF schedules. Accordingly, defendants' motion for partial summary judgment against plaintiffs' claims of fraud is granted.

### CONCLUSION

Based on the foregoing, I affirm my previous opinion regarding plaintiffs' ability to pursue penalty wages under § 10313. In addition, I find that while plaintiffs' claims of "blacklisting" do not fall within federal maritime jurisdiction, they shall be retained under the doctrine of pendent jurisdiction. Finally, I conclude that there are no genuine issues of material fact to support plaintiffs' fraud claims. Accordingly, defendants' motion for reconsideration is denied, defendants' motion to dismiss plaintiffs' blacklisting claims is denied, and defendants' motion for partial summary judgment against plaintiffs' fraud claims is granted.

**6.** Plaintiffs' attempt to rely upon the theory of "constructive fraud," which is not included within their third amended complaint, is equally unavailing. Although the common law theory of constructive fraud dispenses with the requirement of scienter, plaintiffs must demonstrate the existence of a special trust or fiduciary relationship. *First Citizens Federal S & L v.* *Worthen Bank & Trust,* 906 F.2d 427, 429–430 (9th Cir.1990).

Plaintiffs do not allege, nor do I find anything in the record to indicate that the parties enjoyed a relationship even remotely resembling that of fiduciaries. In fact, given the substance of their deposition testimony, plaintiffs had every reason *not* to trust their employers.