**Edwin A. JOSE, et al., Plaintiffs,**

v.

**M/V FIR GROVE, In Rem, et al., Defendants.**

**Civ. No. 90–6028–MA.**

United States District Court, D. Oregon.

Oct. 15, 1991.

---

Richard J. Dodson, Law Offices of Richard J. Dodson, Baton Rouge, La., John Buehler, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for plaintiffs.

Craig Murphy, John Cowden, Wood Tatum Wonacott & Landis, Portland, Or., for defendants.

## OPINION

MARSH, District Judge.

Plaintiffs are fourteen foreign seamen who filed this action seeking to recover back wages and penalties pursuant to 46 U.S.C. § 10313 as well as compensatory and punitive damages for common law claims of blacklisting, outrageous conduct, breach of the duty of good faith and fair dealing, duress, intentional infliction of emotional distress, fraud [1] and a newly asserted claim under the federal racketeering law, 18 U.S.C. § 1961, *et seq.*[2] In addition, plaintiff Edwin Jose and his wife, Augustine Jose, seek to recover damages for a maritime personal injury under the Jones Act, 46 U.S.C.App. § 688 and general maritime law of the United States. Pursuant to

---

1. On October 11, 1990, I granted defendants' motion for summary judgment against plaintiffs' fraud claims. *Jose v. M/V FIR GROVE,* 765 F.Supp. 1024 (D.Or.1991). Thus, this claim is included solely to preserve the issue in the event of an appeal.

2. On June 24, 1991, I granted plaintiffs' motion for leave to file a fifth amended complaint to add two additional defendants and the allegations under RICO.

my order of June 24, 1991, defendants were ordered to file any additional dispositive motions and were directed to address the effect of plaintiffs' most recent amendments on the issue of *forum non conveniens*. Defendants now move to dismiss all of plaintiffs' pendent claims under the doctrine of *forum non conveniens*. In addition, defendants seek dismissal of the Joses' personal injury claims pursuant to Fed.R.Civ.P. 12(b)(6) and dismissal of plaintiffs' claims under RICO pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6). For the reasons that follow, defendants' motion to dismiss all pendent claims under the doctrine of *forum non conveniens* is granted, defendants' motion to dismiss the Joses' personal injury claims for failure to state a claim is denied as moot, and defendants' motion to dismiss plaintiffs' RICO claims for lack of subject matter jurisdiction and for failure to state a claim is granted.

## STANDARD

■■■ Dismissal for failure to state a claim is proper only when it appears to a certainty that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987). For the purpose of the motion to dismiss, the complaint is liberally construed in favor of the plaintiff, and its allegations are taken as true. *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1332 (9th Cir.1987).

## DISCUSSION

The factual background of this case and the pleading history have been set forth in three published opinions and will not be repeated here. *See Jose v. M/V FIR GROVE*, 765 F.Supp. 1015 (D.Or.1990); *Jose v. M/V FIR GROVE*, 1991 AMC 857, 1990 WL 302728 (D.Or.1990); and *Jose v. M/V FIR GROVE*, 765 F.Supp. 1024 (D.Or. 1991). The issue before me now is also not a new one—that of the propriety of this court's retention of jurisdiction over plaintiffs' pendent claims for blacklisting, outrageous conduct, breach of the duty of good faith and fair dealing, duress, intentional infliction of emotional distress and the Joses' personal injury claims.[3]

On October 11, 1990, I determined that I lacked subject matter jurisdiction over plaintiffs' common law claims because their allegations of harm did not fall within the definition of a "maritime injury." At 1020. However, I found that these claims derived from a nucleus of operative facts common to their statutory wage claims such that plaintiffs would expect to try them in one judicial proceeding. *Id.*, at 1021. Accordingly, I retained jurisdiction over plaintiffs' common law claims under the doctrine of pendent jurisdiction.

Thereafter, on February 8, 1991, I considered defendants' motion to dismiss plaintiffs' pendent claims under the doctrine of *forum non conveniens*. In conducting this analysis, I utilized the test set forth by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), and balanced the public and private interest factors present in the case to determine if my exercise of jurisdiction over the pendent claims would be reasonable. At that time, I noted that the Philippines had a significant interest in the outcome of the litigation such that the law of the Philippines should apply to plaintiffs' pendent claims. At 1035–36. However, I felt that the private interest factors of convenience, judicial economy, costs of litigation and deference to the plaintiffs' choice of forum outweighed the interests of the Philippines in trying this case in a local court. *Id.* Accordingly, I denied defendants' motion to dismiss.

On May 24, 1991, plaintiffs sought an extension of deadlines to complete additional discovery in the Philippines and Japan, leave to file a fifth amended complaint in which they wished to add two additional

**3.** On February 8, 1991, I held that U.S. law would not apply to the Joses' personal injury claims under the Jones Act, 46 U.S.C.App. § 688, or general maritime law. Accordingly, these claims are included within my discussion of the dismissal of plaintiffs' "pendent" claims under the *forum non conveniens* doctrine.

foreign defendants [4], and leave to supplement the pretrial order with over 350 pages of documents. Plaintiffs acknowledged that these requests would necessitate the loss of the most recent trial setting of July 16, 1991, but argued that the interests of justice required an indeterminate additional period of time to follow up on newly discovered evidence. Although I granted all of plaintiffs' requests, my concerns about the convenience of trial in this jurisdiction, judicial economy and costs of litigation were raised again. Thus, I directed defendants to address the impact of plaintiffs' expansion of the scope of the litigation on the issue of *forum non conveniens*.

### a. *Forum Non Conveniens* [5]

District courts have broad discretion to retain or refuse to retain jurisdiction under the *forum non conveniens* doctrine. *Canada Malting Co. v. Paterson Steamships*, 285 U.S. 413, 418, 52 S.Ct. 413, 414, 76 L.Ed. 837 (1932); *Dalla v. Atlas Maritime Co.*, 562 F.Supp. 752, 757 (C.D.Cal. 1983), *aff'd* 771 F.2d 1277 (9th Cir.1985). This discretion is to be exercised "with regard to what is right and equitable under the circumstances and the law and directed by the reason and conscience of the judge as to a just result." *Dalla*, 562 F.Supp. at 757, *citing Langnes v. Green*, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931). Thus, in considering any dismissal on the basis of *forum non conveniens*, the court must first determine whether an alternative forum exists. *Lockman Foundation v. Evangelical Alliance*, 930 F.2d 764, 767 (9th Cir.1991). Defendants bear the burden of producing sufficient evidence to justify this court's refusal to retain jurisdiction. *Dalla*, 562 F.Supp. at 757, *citing Philippine Packing Corp. v. Maritime Co. of Philippines*, 519 F.2d 811, 812 (9th Cir. 1975).

In conducting this test, I must balance public and private interest factors identified in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). *Lockman*, 930 F.2d at 767; *Villar v. Crowley Maritime*, 782 F.2d 1478, 1482 (9th Cir.1986). Relevant private interest factors include: the relative ease of access to sources of proof, availability of witnesses and "all other practical problems that make a trial of a case easy and inexpensive." *Gulf Oil*, 330 U.S. at 508, 67 S.Ct. at 843. Relevant public interests include the burden on a court and jury with no relation to the litigation; the local interest in having the case decided at home; and the deference to a forum that is at home with the governing law. *Id.* at 508–509, 67 S.Ct. at 843.

In my first opinion denying defendants' motion to dismiss on *forum non conveniens* grounds, I placed great reliance upon Judge Lawrence's reasoning in *Kearney v. Savannah Foods & Industries, Inc.*, 350 F.Supp. 85 (S.D.Ga.1972). In *Kearney*, Judge Lawrence declined to split an action filed by the Irish administratrix of a deceased Irish seaman for wrongful death against an Irish vessel owner, the manufacturer of a catwalk and the Georgia corporation that maintained the catwalk. I concurred with Judge Lawrence's approach based primarily upon my finding that the evidence to be adduced as to plaintiffs' wage claims would also be relevant to and a part of the trial on plaintiffs' blacklisting claims.

However, upon further consideration, I also note that several of the other private interest factors identified in *Gulf Oil* weigh heavily in favor of a trial in the Philippines. First and foremost, I note defendants' proffer that, if plaintiffs' pendent claims are dismissed, they agree to submit to the jurisdiction of the Philippine courts. Thus, plaintiffs have an adequate alterna-

---

**4.** Newly added defendants include Western Shipping Agency, Inc., a Philippine corporation, and Yeh Shipping Co., Ltd., a Hong Kong corporation.

**5.** Again, I have previously set forth the factors I must consider in a *forum non conveniens* inqui-

ry in *Jose*, 765 F.Supp. 1037, as well as the related case of *Su v. M/V SOUTHERN ASTER*, 767 F.Supp. 205 (1990). They are repeated here for the convenience of the parties.

tive forum. Second, all of the plaintiffs reside in the Philippines and may not be able to obtain visas to come to the United States for trial. All defendants reside in Japan and, although they would be inconvenienced by a trial in either forum, the Philippines would be more convenient given their business ties to that country. Third, all sources of proof are located in Japan, Hong Kong and the Philippines. Although both parties filed exhibits in anticipation of the July 16, 1991 trial, the most recent submissions of plaintiffs' counsel convince me that discovery is far from complete and that the submissions currently on file will be significantly augmented.

In addition, the most recent round of motions demonstrates that the public interest factors favoring litigation in the Philippines is even stronger than I had earlier anticipated. In their response to defendants' motion to dismiss the Joses' personal injury claims, plaintiffs concede that the claims of Augustine Jose for loss of consortium and related damages are not recoverable under Philippine law. However, the parties actively dispute whether Edwin Jose's claims are barred by Article 217 of the Philippine Labor Code. In their briefs, neither party has cited a single case to support their interpretation of the Philippine Labor Code provisions, but instead they rely upon expert affidavits and memoranda between the Philippine Department of Labor and the Philippine Social Security Administration.[6] Thus, if I were to retain jurisdiction over these claims, a federal District Court sitting in Oregon would be interpreting an interactive series of Philippine statutes—the Philippine Workers Compensation Act which involves the State Insurance Fund, the Philippine Civil Code and Philippine Maritime Law—and resolving unsettled issues of Philippine law. I find that such a result would be an impermissible extension of this court's authority which could directly conflict with the inter-

ests of the Philippine government in the uniform application of its labor statutes as well as the interests of the Philippine courts or administrative agencies in interpreting unsettled or untested Philippine law.

In light of all of the facts and circumstances which have become apparent to me throughout the history of this case, I find that the private interest factors of convenience, judicial economy, costs of litigation and deference to the plaintiffs' choice of forum are divided. Although there would necessarily be some overlap in the evidentiary presentation necessary to establish plaintiffs' wage and non-wage claims, I find that the convenience to all parties and witnesses would be better served by trial in the Philippines. As to the public interest, I find that all factors favor trial in the Philippines in light of the substantial local interest in uniform application of Philippine Labor law as well as the deference to the forum which will be at home with the governing law. Based upon the foregoing, I find that both private and public interests factors favoring trial in the Philippines outweigh deference to plaintiffs' choice of forum and any economy that might be gained by a single trial within this district. Accordingly, defendants' motion to dismiss plaintiffs' pendent common law claims is granted and their motion to dismiss the Joses' personal injury claims for failure to state a claim under the Philippine Labor Code is denied as moot.

b. *RICO*

■ In Count IV of their Fifth Amended Complaint, plaintiffs contend that defendants engaged in a "pattern of racketeering" by deliberately misrepresenting pay scales to plaintiffs and to the International Transport Workers Federation (ITF). Plaintiffs contend that they were deprived of "property" each month that they received wages lower than those set forth in

---

**6.** Had this dispute arisen under Oregon law, I would have the option of certifying the question as one of "first impression" to the Oregon Supreme Court under O.R.S. 28.200, *et seq.* Alternatively, I could have declined to exercise pendent jurisdiction over this claim pursuant to 28

U.S.C. § 1367(c)(1)–(2) on the basis that the claim involves an unsettled issue of state law. However, because this case involves disputed issues of the laws of another nation, I have none of these options available to me.

ITF wage schedules. Plaintiffs assert that U.S. RICO laws should apply to their claims because the Fir Grove made all of its voyages from the United States to Japan and hence, the activity of the defendant shipowners had an impact upon U.S. commerce.[7]

Defendants move to dismiss plaintiffs' federal RICO claims on two grounds: first, defendants contend that United States RICO laws should not be applied to plaintiffs' claims based upon the lack of contacts or connection to this country; second, defendants contend that plaintiffs' RICO claims are merely an attempt to "rekindle" previously dismissed fraud claims.

Because the allegedly fraudulent conduct regarding misrepresentation of the applicable pay scales took place in the Philippines and Japan, the plaintiffs are all from the Philippines, the defendants are all from Japan or the Philippines, and the only connection to the United States is that the Fir Grove sailed to the U.S. to pick up shipments of logs, I find that the alleged conduct which forms the basis of plaintiffs' RICO claims took place outside of the U.S. territory. Therefore, I must now turn to the issue of the application of RICO by foreign plaintiffs to foreign defendants and extraterritorial conduct.

(1) Subject Matter Jurisdiction

█  I first note that extraterritorial application of a federal statute is a matter of statutory interpretation rather than choice of law analysis. *EEOC v. Arabian American Oil Co.*, ── U.S. ──, ──, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (Court defined its task as determining whether Congress intended the protection of Title VII to apply to U.S. citizens employed abroad); *Windward Shipping (London) Ltd. v. American Radio Ass.*, 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974) (application of NLRA to unions picketing foreign ships) and *Cruz v. Chesapeake Shipping,*

932 F.2d 218, 224–226 (3rd Cir.1991) (in determining whether FLSA applied to Filipino seamen employed on reflagged Kuwaiti tankers, court found Congress failed to evince an intent to expand traditional scope of "affecting commerce" language).

In *EEOC*, the Court held that Title VII of the Civil Rights Act of 1964 did not apply to a United States Citizen employed abroad by American employers. The Court began its inquiry by noting the "long standing principle of American law" that Congressional legislation is presumed to apply only within the territorial jurisdiction of the United states unless a contrary intent is "clearly expressed." *Id.*, ── U.S. at ──, 111 S.Ct. at 1230; *see also Independent Union of Flight Attendants v. Pan Am Airways, Inc.*, 923 F.2d 678 (9th Cir. 1991) (noting presumption against extraterritorial application of federal statutes and refusing to apply RLA to foreign flights in light of potential conflicts between foreign and domestic law and deference to Congressional policy making). The Court found that, although Congress used broad language by providing for civil liability against employers who "engage in an industry affecting commerce," it did not clearly disclose an intention to give Title VII extraterritorial effect. *Id.*, ── U.S. at ──, 111 S.Ct. at 1232. In support of this conclusion, the Court also noted the following factors: (1) Title VII fails to provide any mechanisms for overseas enforcement, such as rules governing foreign service of process; (2) the statute provides geographically limited venue and investigative authority; and (3) Congress failed to address the subject of conflict with foreign laws and procedures. *Id.*, ── U.S. at ──, 111 S.Ct. at 1234; *Smith v. United States*, 932 F.2d 791 (9th Cir.1991) (declining to apply FTCA, in part, on basis that its venue provisions are "ill-suited" to extraterritorial application).

---

**7.** As noted in my previous opinions, the alleged misrepresentations which form the basis of plaintiffs' wage and fraud claims took place in Manila, where they were recruited, and in Japan, where they joined the ship and were given copies of the ITF Collective Agreement. Plaintiffs received 20% of their wages on a monthly basis on board the ship wherever the ship was located which would include the high seas, Japan, and U.S. waters. The remaining 80% were paid on a monthly basis to plaintiffs' designated representatives in the Philippines.

In contrast, courts have found that the Sherman Antitrust Act and the Securities Exchange Act of 1934, which are also silent as to extraterritorial application, may be applied to foreign parties and foreign conduct. *Timberlane Lbr. Co. v. Bank of America*, 549 F.2d 597 (9th Cir.1976) (*Timberlane I*) (Sherman Act extends to some conduct in other nations); and *Alfadda v. Fenn*, 935 F.2d 475, 478–79 (2nd Cir.1991) (discussing alternative "conduct" and "effects" tests to determine whether to exercise subject matter jurisdiction over a foreign plaintiff's claim under the antifraud provisions of the securities act).

However, even in the areas of U.S. law, such as antitrust and securities fraud, where it is now well established that extraterritorial application of U.S. laws is permissible, courts have embraced a cautious approach. In *Timberlane I*, the Ninth Circuit emphasized that, although American law covers some conduct which takes place beyond U.S. borders, the concerns of other nations and respect for their interests must be a factor the court considers prior to any decision to exercise jurisdiction: "[i]t is evident that at some point the interests of the United States are too weak and the foreign harmony incentive for restraint too strong to justify an extraterritorial assertion of jurisdiction." 549 F.2d at 609–612. Thus, the court adopted a "tripartite" analysis for application of the Sherman Act to foreign defendants: first, there must be some effect, actual or intended, on American foreign commerce; second, plaintiff should make a greater showing of burden or restraint; and third, the interests of the U.S. must be sufficiently strong vis-a-vis those of other nations to justify an assertion of extraterritorial authority. *Id.*, at 613. The elements to be weighed in the third prong of this analysis include: (1) the degree of conflict with foreign law or policy;[8] (2) the nationality or allegiance of the parties and the locations or principal places of business of corporations; (3) the extent to which enforcement by either state can be expected to achieve compliance; (4) the relative significance of effects on the U.S. as compared with those elsewhere; (5) the extent to which there is an explicit purpose to harm or affect American commerce; (6) the foreseeability of such effect; and (7) the relative importance to the violations charged of conduct within the U.S. as compared with conduct abroad. *Id.*, at 614. The *Timberlane* analysis continues to be applied by the Ninth Circuit in cases which involve the reach of U.S. antitrust laws. *See e.g. In Re Insurance Antitrust Litigation*, 938 F.2d 919, 932–934 (9th Cir.1991).

Thus, the primary focus of my inquiry is Congressional intent: did Congress intend that the federal civil RICO statute should be applied extraterritorially to foreign defendants based upon claims of foreign plaintiffs, and if so, in what circumstances and with what, if any, limitations.[9] In so doing, I should also consider the tripartite test and seven "comity" elements identified by the Ninth Circuit in *Timberlane I*.

Like Title VII and the Securities and Exchange Act, the RICO statute is silent as to its extraterritorial application. The RICO statutes, 18 U.S.C. § 1961, *et seq.*, prohibit a defined list of "racketeering" activities which "affect interstate or foreign commerce." § 1962(a). Section 1961 defines "racketeering" and includes a wide variety of activities ranging from murder and extortion to interstate fraud and any activity directed at the obstruction of justice. Violations of section 1962 may be challenged by an action commenced pursu-

---

**8.** In *Timberlane Lumber Co. v. Bank of America*, 749 F.2d 1378, 1384 (9th Cir.1984) *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985) (*Timberlane II*), the court declined to apply U.S. antitrust law to a case filed by Oregon plaintiffs against an American Bank and two Honduran corporations on the basis that enforcement would lead to a "significant conflict with Honduran law and policy."

**9.** As with the issue of *forum non conveniens,* defendants' latter motion also raises a basic issue that has persisted throughout the course of the litigation of this and other parallel proceedings—that of the reach of U.S. laws to foreign parties in what is essentially a foreign labor dispute. However, unlike the U.S. Shipping Act, 46 U.S.C. § 10313, which expressly proves that it is to apply to seamen aboard foreign vessels, the federal RICO statute contains no such guidance as to its extraterritorial reach.

ant to section 1963, which provides criminal penalties, or section 1964, which provides civil remedies for "any person injured in his business or property by reason of a violation of § 1962." Section 1965(a) provides that venue over any civil action brought pursuant to this chapter may be instituted in the "district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." Section 1965(c) provides a procedure for the issuance of subpoenas to compel attendance of witnesses residing in any other judicial district.

▆▆▆ The underlying purpose of both the criminal and civil RICO statutes is to eradicate the economic impact and influence organized crime has on the national economy:

> "[o]rganized crime in the United States annually drains billions of dollars from America's economy ... weakens the stability of the Nation's economic system, harms innocent investors and competing organizations, interferes with free competition, seriously burdens interstate and foreign commerce, and undermines the general welfare of the Nation and its citizens."

*United States v. Noriega*, 746 F.Supp. 1506, 1516–17 (S.D.Fla.1990) *citing* RICO Statement of Findings and Purpose, Pub.L. No. 91–452, 84 Stat. 922 (1970), 91st Cong., 2d Sess; reprinted in 1970 U.S.Code Cong. & Admin.News 1073. The language in the RICO statute is extensive and has been broadly construed by courts to reach a wide array of activity. *See e.g. Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir.1988) *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989) (court maintained jurisdiction over RICO claim brought by Philippine government against deposed president for allegedly converting funds belonging to the Philippine people by investing in U.S. properties); and *West Hartford v. Operation Rescue*,

726 F.Supp. 371 (D.Conn.1989) (use of RICO against anti-abortion protesters).

Although I have been unable to find any cases within the Ninth Circuit which directly address the extraterritorial reach of civil RICO,[10] at least one court has found that the criminal RICO statutes may be applied to foreign defendants whose activity takes place wholly outside of the United States. In *Noriega*, the government sought criminal RICO sanctions against the former leader of the Panamanian armed forces alleging that he engaged in a pattern of activity designed to distribute and import cocaine into the United States. Noreiga claimed that the extraterritorial application of U.S. criminal law was unreasonable since there was no allegation that he performed any act within the borders of the United States. After reviewing the legislative history and broad scope of the Act, the court determined that with RICO, Congress was primarily concerned with the "effects and not the locus of racketeering activities." *Noriega*, 746 F.Supp. at 1517. Accordingly, the court held that RICO could be applied to extraterritorial conduct where the activity produces or is intended to produce an effect in this country. *Id; see also United States v. Davis*, 905 F.2d 245, 248 (9th Cir.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991) (court held that application of Maritime Drug Enforcement Act was consistent with due process where defendant intended to smuggle contraband into the U.S.); and *Marcos*, 862 F.2d at 1358 (bringing stolen property into U.S. is sufficient nexus for civil RICO liability); *Compare Alfadda*, 935 F.2d at 480 (predicate acts which occurred primarily in the U.S. were sufficient to serve as a basis for subject matter jurisdiction).

In an analogous context, the Eleventh Circuit found that foreign defendants, who allegedly conspired with others to launder proceeds of a multimillion dollar armed robbery through U.S. banks, were amenable to process in a U.S. court even though the

---

**10.** In *Marcos*, the Ninth Circuit found that the allegations that the defendants had smuggled stolen property *into* the U.S. and converted it into U.S. holdings was sufficient to satisfy subject matter jurisdiction. Thus, the court did not reach the issue of the extraterritorial application of RICO to foreign defendants who commit acts outside of the territorial boundaries of the U.S.

robbery took place in England. *Brink's Mat Ltd. v. Diamond*, 906 F.2d 1519, 1521 (11th Cir.1990). The majority of the court began by noting that its jurisdiction over the defendants, both citizens of the United Kingdom, depended upon "the existence of a sufficient relationship between the defendant and the forum and the defendant's amenability to process in that court." *Id.* The court held that, although RICO contains no provision for service of process on foreign defendants, it could look to the Fed.R.Civ.P. 4(e) which provides that, if state law permits it, the law of the state in which the court sits may be used to bring a foreign party within the jurisdiction of a federal court. Thus, the court concluded that defendants were amenable to service of process abroad.[11] In his dissent, Judge Aldisert reasoned that Congress could have easily included a cross-reference to Fed. R.Civ.P. 4 if it had intended to expand the service provisions of RICO, and that its failure to do so should be strictly construed. *Id.*, at 1524. He also noted the absence of any evidence of Congressional intent to apply RICO beyond the borders of the U.S.:

> "It was not Congressional intent, nor would it be proper were that the case, to deter the conduct of parties unconnected to the United States, or to provide windfall civil judgments to citizens of any country who sue citizens of another country for fraudulent transactions which casually touch upon the United States. Congress only intended to deter the conduct of individuals within the borders of this country."

*Id.* Finally, Judge Aldisert noted that his conclusion would not deprive plaintiffs of a remedy since the British courts are open to provide effective relief. *Id.*, at 1524.[12]

Based upon the foregoing, I find that the language and legislative history of RICO fail to demonstrate clear Congressional intent to apply the statutes beyond U.S. boundaries. As the district court in *Noriega*, points out, courts have construed RICO "broadly." However, RICO has been broadly construed to cover a wide array of *conduct* in light of the expansive language found within section 1962, but geographically, the procedural mechanisms contained within section 1965 are, on their face, limited to U.S. territory. Thus, I find that the presumption against extraterritorial application of federal statutes has not been overcome by clearly expressed congressional intent within the RICO statutes or legislative history.

However, even if RICO could apply to foreign defendants for conduct which takes place outside of the U.S., I find that the factors employed in *Timberlane I* weigh against extraterritorial application in this case. First, I find that the effect on American commerce caused by defendants' paying lower wages than required under the ITF agreement to the 14 plaintiffs in this case is negligible if it is present at all. I also note the absence of any allegations or evidence which would tend to show that defendants intended to effect American commerce.

What is most compelling in this case, however, is the interests of the U.S. vis-a-vis those of other nations, the third factor identified in *Timberlane I*.[13] As noted above in my discussion of pendent jurisdiction and in my February 8, 1991 opinion addressing the conflict of laws issue, the interest of the Philippines in resolving what is essentially a labor dispute is significant. If proven, the effects of defendants' prac-

**11.** In light of its conclusion, the court found that it need not reach the issue of whether defendants had a constitutionally significant relationship with the district of Florida which would permit the exercise of personal jurisdiction. *Id.*, 906 F.2d at 1523.

**12.** Although I need not reach the issue of whether service of process is available against foreign defendants under section 1965, I find Judge Aldisert's reasoning helpful to the statutory interpretation of RICO's extraterritorial reach and

more consistent with the Supreme Court's recent analysis in *EEOC* since he applies the presumption against extraterritoriality. In addition, I find his emphasis on weighing U.S. interest against that of Great Britain helpful in that he utilizes factors similar to those identified by the Ninth Circuit in *Timberlane I*.

**13.** I note that the second factor identified in *Timberlane I* regarding plaintiff's heightened burden to show a restraint on trade, is inapplicable outside of the antitrust context.

tices could have a significant impact upon regulation of manning and recruitment practices in the Philippine shipping industry whereas the effect upon U.S. commerce, if any, would be minimal. The nationality and allegiance of the parties is primarily in the Philippines and Japan, with defendants' principal place of business located in Japan.[14] Thus, I find that the Fir Grove's limited contacts with the U.S. are insufficient to create the requisite casual nexus to this country or to American commerce to invoke the procedural remedies of civil RICO. Accordingly, defendants' motion to dismiss plaintiffs' fourth claim for lack of subject matter jurisdiction is granted.

### (2) Failure to State a Claim

■ In addition, I find that plaintiffs' claims under RICO are merely restatements of their previously dismissed fraud claims. I have already found that plaintiffs neither relied upon the alleged misrepresentations, nor were they ever actually told that they would receive ITF wages. Opinion of October 11, at 1023. Accordingly, plaintiffs could not have suffered an injury as a direct result of the alleged unlawful activities as required by section 1964(c).[15]

### CONCLUSION

Based upon the foregoing, I find that dismissal of plaintiffs' pendent claims under the doctrine of *forum non conveniens* is necessary in light of the significant public and private interest factors which weigh in favor of proceeding in the Philippines. In addition, I find that federal RICO statutes may not be applied to the extraterritorial conduct alleged against the foreign defendants in this case in light of the presumption against such application and the insufficient nexus to U.S. commerce when balanced against the interest of the Philippines. Accordingly, defendants' motion to dismiss pendent claims is granted, their

motion to dismiss Edwin and Augustine Joses' personal injury claim is denied as moot, and their motion to dismiss RICO claims is granted for lack of subject matter jurisdiction and failure to state a claim.

---

**14.** Because plaintiffs seek only monetary damages for past conduct, the extent to which enforcement by either state can be expected to achieve compliance is inapplicable to this case.

**15.** Section 1964(c) provides for civil enforcement of the RICO chapter by any person "injured in his business or property by reason of a violation of section 1962."