**Edwin A. JOSE, et al., Plaintiffs,**

v.

**M/V FIR GROVE, In Rem, et al., Defendants.**

**Civ. No. 90–6028–MA.**

United States District Court, D. Oregon.

April 27, 1992.

---

Richard J. Dodson, Law Offices of Richard J. Dodson, Baton Rouge, La., John Buehler, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for plaintiffs.

Craig Murphy, John Cowden, Wood Tatum Wonacott & Landis, Portland, Or., for defendants.

## OPINION

MARSH, District Judge.

The motor vessel FIR GROVE set out on its maiden voyage from the Shin Kurushimi dock yard A at the Port of Onishi, Japan, in January of 1989. The FIR GROVE is owned by Delica Shipping, S.A. and was designed and built by Hisao Otani, an engineer for Inui Steamship, Ltd. The plaintiffs are fourteen former crew members of the FIR GROVE who were recruited to work aboard the vessel by Noimi Zabala, a manning agent in the Philippines. Shortly after arriving in Japan from Manila, plaintiffs boarded the vessel and set sail from Japan with an empty cargo hold headed for North America. The FIR GROVE made six round trip voyages from Japan to the U.S. and Canada to pick up logs for delivery to various ports in Japan. However, on the seventh voyage to Canada and the United States, one of the crew members, plaintiff Edwin Jose, suffered an injury and was discharged for medical care in Adak, Alaska. By the time the vessel reached Coos Bay, Oregon, Mr. Jose met his crew at the Port. Mr. Jose and thirteen other seamen obtained legal counsel, filed a complaint in this court and arrested the vessel.

This action arises out of an employment dispute between those fourteen seafarers who worked aboard the M/V FIR GROVE from January 1989 to January 19, 1990, and the Japanese owners of that vessel. Plaintiffs claim they were paid less than

the amount of wages specified in the shipping articles for almost a year prior to the arrest of the vessel. Plaintiffs also contend that they have been "blacklisted" by defendants and their agents in Manila and that they have been unable to find work since filing this action. Defendants admit that plaintiffs were not paid the wages specified in the shipping articles, but argue that the applicable wage rate appears instead in manning contracts signed in the Philippines. Plaintiffs originally sought back wages, penalties on those wages, and damages under various common law tort theories and RICO. Plaintiff Edwin Jose and his wife, Augustine, also sought damages for a personal injury which Mr. Jose sustained while working on board the vessel. Over the last two years, the legal issues involved in this case have undergone extensive briefing and motion practice, discussed more fully, *infra*. However, after the seas had calmed, only two claims were left for trial to the court: (1) the claim for back wages; and (2) plaintiffs' claims for penalties on those back wages under 46 U.S.C. § 10313(g). A four day trial was held on March 31—April 3, 1992. The following constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### I. BACKGROUND [1]

a. *History & The Industry*

At trial, counsel for both parties presented evidence and testimony from maritime experts regarding the historical development and practices of the international maritime shipping industry along with the historical development and purposes behind the wage provisions in the U.S. Shipping Act. Although much of this testimony went far beyond the relevant issues before me, I found that this historical backdrop was an invaluable "tool" to use as an aid in understanding just what occurred in this case. With few exceptions, which I will focus upon in the course of my discussion, the parties agree to the pertinent historical facts which follow.

The relevant wage provisions of the U.S. Shipping Act, 46 U.S.C. § 10313(e) & (f), originally derive from § 6 of the Act of July 20, 1790, c. 29; 1 Stat. 133. 1 M. Norris, *The Law of Seamen*, § 17:1 (1985). Section 6 was codified as part of the Shipping Commissioner Act in 1872, Chapter 33, 17 Stat. 269. Section 6 provided, in relevant part, that every seaman could demand and receive up to one-third of all wages due at every port where the vessel delivered cargo and that every seaman could recover the balance of all wages "as soon as the voyage ended, and the cargo or ballast be fully discharged at the last port of delivery." In 1915, the statute was amended at 46 U.S.C. § 596 and 597 to extend the coverage of the act to include foreign seamen.[2] As Senator Fletcher explained, the purpose behind the statute was threefold:

> "First, to give freedom to seamen and improve their conditions; second, to promote safety of life at sea; third, to equalize the wage cost of operating vessels, foreign and domestic, taking cargos or passengers from ports of the United States."

Congressional Record–Senate, October 22, 1915 at 5748.

In the Memorandum decision of Justice Brandeis in *Strathearn S.S. Co. v. Dillon,* (1919) *reprinted in* Harv.L.Rev., Vol. 69, May 1956, No. 7, at pp. 1177–1205 (1956), and attached as Appendix XV to defendants' trial memo, he addresses the issue of whether, and to what extent, Congress had the power to confer such rights upon seamen who work aboard foreign vessels under shipping articles made abroad and governed by the laws of a foreign nation.

---

**1.** Brief versions of the factual background of this case and its pleading history have been set forth in several published opinions. *See Jose v. M/V FIR GROVE,* 765 F.Supp. 1015 (D.Or.1990) (granting summary judgment against plaintiffs' fraud claims); and *Jose v. M/V FIR GROVE,* 765 F.Supp. 1024 (D.Or.1991) (applying conflict of law analysis to find Philippine law should apply to pendent tort claims); *Jose v. M/V FIR*

*GROVE,* 765 F.Supp. 1037 (D.Or.1991) (denying plaintiffs' demand for a jury trial and holding that trial would be to the court).

**2.** Subsections (f) and (e) of 46 U.S.C. § 10313 correspond to 46 U.S.C. § 596 and 597 respectively.

In *Strathearn*, foreign vessel owners and the British Embassy argued that Congress was without power to confer a right to the seamen to demand one-half wages in a port of the United States. Justice Brandeis traced the history of the Act and found first, that the Act is "primarily" directed towards the master-servant relationship and "designed to complete the emancipation of American seamen."[3] Thus, the primary purpose of the Act is to insure that a seaman will be paid his wages promptly upon discharge in a U.S. port, and will not be "turned ashore with nothing in his pockets" after his right to food and shelter on the vessel is terminated. *Chung Yong Il v. Overseas Navigation Co.*, 774 F.2d 1043 (11th Cir.1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1802, 90 L.Ed.2d 346 (1986); *Thomas v. S.S. Santa Mercedes*, 572 F.2d 1331, 1334 (9th Cir.1978) (purpose is to give seaman funds on which to live when he is left ashore); *Loberiza v. Calluna Maritime Corp.*, 781 F.Supp. 1028 (S.D.N.Y. 1992); *see also Petersen v. Interocean Ships, Inc.*, 823 F.2d 334, 337 (9th Cir. 1987).

In addition, Justice Brandeis discussed Congress' concern over the decline of the American maritime industry due to competition from unregulated foreign vessels. Thus, in a hopeful attempt to indirectly equalize operating costs throughout the world:

> "Congress concluded that if seamen on foreign vessels were freed from liability to arrest in our ports for desertion and this exemption from arrest were coupled with a provision enabling the seaman to obtain here payment of a substantial part of all wages theretofore earned and remaining unpaid, **foreign vessels engaged in the American trade would be compelled to raise wages and working conditions to practically the standard prevailing in our coast wide trade. For otherwise they would lose many seamen whenever they entered a port of the United States,** and they would be unable to ship new crews except at the rate of wages prevailing in America. As a large part of the world's shipping was required to carry America's export and imports, **some believed this equalization of operating expenses would extend gradually to vessels engaged in the carrying of trade wholly between foreign countries ...**"

*Id.*, at 1183–4 (emphasis added).

The Court further found that the Congressional extension to foreign vessels logically applied once the vessels entered into U.S. ports: "[e]very foreign vessel owes temporary and local allegiance to the country whose port she enters and becomes amenable to the jurisdiction and laws of the country." *Id.*, at 1185. Thus, the Court concluded that Congress has the power to prescribe conditions of entry, and those conditions override any contrary contractual stipulations. *Id.*, at 1187.

Finally, the Court found that Congress expressly intended that the Act should apply to "all" seamen, American and foreign, in order to "give the seamen the right to leave the ship when in a safe harbor." *Id.*, at 1191.

This historical background brings us to the current statutes. In 1983 Congress enacted § 10313 as a part of its revision of the "marine safety and seamen's welfare laws of the United States." S.Rep. No. 98–56, 98th Cong., 1st Sess., p. 1 (1983). The drafters considered the new statute merely a restatement and codification of the existing statutes and case law. *Id.*, at 1, 5–6, 9–10. The portions of the statute set forth

---

**3.** Justice Brandeis noted the evolution of certain humanitarian reform statutes such as the abolition of flogging, corporal punishment, and the arrest of seamen for desertion in American ports in the late 1800s. At trial, Dr. Craig Forsyth testified that the Shipping Act was designed, at least in part, to eradicate the "crimping" system whereby certain manning agents would lure young men into service by providing them with alcohol and prostitutes in boarding-houses near the ports. Once in debt, the seafarer would accept employment aboard a vessel as arranged by the crimp. Often, the wages on a single voyage were insufficient to cover the debt, so upon seafarers' return, they would incur greater debts for which they would again be impressed into service, thus creating a cycle of virtual slavery. *See* generally, Chapman, at p. 19–20.

below are relevant to the determination of the issues in this case:

"(e) After the beginning of the voyage, a seaman is entitled to receive from the master, **on demand, one-half of the balance of wages earned and unpaid at each port at which the vessel loads or deliver cargo during the voyage.** A demand may not be made before the expiration of 5 days from the beginning of the voyage, not more than once in 5 days, and nor more than once in the same port on the same entry. If a master does not comply with this subsection, the seaman is released from the agreement and is entitled to all wages earned. Notwithstanding a release signed by a seaman under section 10312 of this title, a court having jurisdiction may set aside, for good cause shown, the release and take action that justice requires. This subsection does not apply to a fishing or whaling vessel or a yacht.

(f) **At the end of the voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier.** When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.

(g) When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman **2 days' wages** for each day payment is delayed.

\*　　\*　　\*　　\*　　\*　　\*

(i) **This section applies to a seaman on a foreign vessel when in a harbor of the United States. The courts are available to the seamen for the enforcement of this section.**"

(emphasis added).

Congress' concerns over the longevity of the American merchant marine were well founded. According to Dr. Herbert Northrup, a retired Professor of Labor Economics from the Wharton School at the University of Pennsylvania, and as corroborated by the testimony of Dr. Craig Forsyth, an Associate Professor of Marine Sociology at the University of Southern Louisiana, the American merchant marine has been in a downward "tailspin" since World War II. Both experts testified that the downtrend in America is due, in large part, to the rise of so-called "Flag of Convenience" or FOC shipping. With the growth of world trade, one method vessel operators have used to reduce costs is to register their ships in countries with little to no regulations over crew nationality, safety, and taxes. Liberia, Panama and Vanuatu are the three most popular FOC registration locations since they charge no taxes, registration is simple and the vessel owner can hire an all foreign crew. The Philippines, South Korea, India and Indonesia are the major suppliers of seafarers for FOC vessels. *See* generally, Paul K. Chapman, Trouble on Board, xxiii–xxvi (Cornell University, ILR Press 1992); and Herbert Northrup, The ITF and FOC Shipping, 106 (University of Penn., 1983).

The United States is not the only country affected by the rapid rise in reliance upon FOC shipping. The shipping industry in the countries of Western Europe and Australia has also experienced significant decline. To combat this decline, the International Transport Workers' Federation (ITF), established in 1896, has taken on a leading role in the Western effort to equalize shipping costs, raise wages and improve working conditions on FOC vessels. The ITF is an International Secretariat with national "affiliates" such as AMOSUP (in the Philippines) and the JSU (Japan). The ITF lobbies the United Nations for reforms and has developed a world wide wage scale which it hopes will become the standard in the industry. However, the central control of the ITF organization is dominated by leaders of industrialized western nations. Beginning in the early 1970s, a number of Asian countries began conducting conferences over their concerns that the so-called "world wide" wage rates were simply too high for third world country seamen. *See*

generally, Northrup, at 96–102.[4]

In response to the Asian concerns, the ITF developed a compromise program known in the industry as a "blue certificate" or a "blue card." In this program, the ITF works through its affiliates in an effort to force FOC operators to enter into "legitimately negotiated" collective bargaining agreements (CBAs). If for example, a Japanese ship owner agrees to cooperate with the ITF, the ship owner (or its designated agent) will enter into a CBA with the affiliate from the seafarers' home country. Typically, this CBA will contain a higher wage rate than that required by the governmental agency of the seafarers' home country charged with the responsibility of overseeing of the wages, but will be less than the ITF's worldwide wage "goal." In addition, the shipowner will agree to make trust payments of approximately $400 per seaman to the ITF and its affiliate. In exchange, the shipowner receives a "blue certificate," which will be shown to ITF inspectors at ports of call. Ships that are discovered in ports in countries such as Sweden or Australia without such a blue certificate may be subject to boycotts by local tug and longshoremen unions. Although such boycotts are prohibited in the United States, Dr. Northrup testified that even the threat of an illegal boycott and the potential delay of one to two days of a cargo vessel is enough to induce most shipowners into at least tacit compliance with the blue certificate program.

However, many shipping companies find that even the lower localized CBA wage agreements are simply too high to accept and remain competitive. Thus, a parallel pseudo ITF program has developed in many of the Asian countries to enable shipowners to pay lower wage rates and yet pass ITF scrutiny and the threat of economic boycotts or legal activity. In this pseudo ITF program, the shipowner signs a collective bargaining agreement with the local ITF affiliate which specifies the affiliate's wage rate. The shipowner will pay the trust the required $400 fee per seaman and a copy of the CBA and trust payment are sent to the ITF Worldwide office in London. The ITF then sends the shipowner or manning agent a "blue certificate" which is kept on board the ship. The seafarers, who are aware of this ruse, are required to sign two separate wage contracts—one containing the lower wage they actually receive and the other, usually the shipping articles, containing the higher wage required under the CBA. *See* Chapman, at p. 40–41. Then, to maintain the illusion that they actually comply with the wage rates specified in the CBA, many vessels maintain two separate sets of books and issue two separate wage receipts each month—one reflecting actual wages paid, and the other reflecting the CBA wage referenced in the shipping articles. Thus, if a seaman is stopped and questioned by an ITF inspector, he is told to display the false wage receipt. The seaman must accept this program or not work. *See* generally, Northrup, at p. 103, and Chapman, at pp. 40–47.

As James Lafferty explained at trial, the Philippine government adopted an official policy of encouraging the exportation of its seafarers to attract hard currency into the country and improve its beleaguered economy. To carry out this policy, the Philippine Overseas Employment Association (POEA) was established in 1974. The POEA was designed to provide seamen with training and placement and, ostensibly, to regulate the hiring agencies to protect the rights of the seamen. The primary emphasis of the POEA, however, has been upon the promotion and development of the exportation of Philippine labor to shipping companies. *See* generally, Chapman at 23–25.

Before a seafarer is permitted to leave the country, the POEA requires that the shipper or manning agent submit copies of

---

**4.** Another cultural "clash" between the Asian and Western countries may be traced to the different mores of the seamen themselves. In his book on the current situation of the Philippine seafarers, Mr. Chapman describes the seafarer's sense of loyalty to the "patron" who helps him obtain a job. The term "utang na loob," in Tagalog is the obligation many workers feel towards the patrons who help them obtain work in spite of the low rate of pay or poor working conditions. Chapman, at pp. 82–83.

the employment contracts for approval. The POEA checks to ensure that the seafarer will remit 70–80% of his basic monthly wages to his family in the Philippines in the form of monthly "allotments" and that the employment contract includes the mandatory minimum wage rate set by the POEA. If these two requisites are met, the POEA issues an exit visa and the seafarer is permitted to leave the country and commence his employment aboard a ship. As of 1983, the POEA had registered over 130,000 seafarers in this manner.

Therefore, the issues presented in this case, against this historical backdrop, are (1) to what wages are the plaintiffs entitled for their service aboard the Fir Grove; and (2) if those wages have not been satisfied in a timely manner, whether, and to what extent, the penalty wage provision in the U.S. Shipping Act may be applied to a foreign vessel owner who has utilized the services of a Philippine manning agent who, by his own admission, engaged in the pseudo ITF program and "double bookkeeping" schemes described above.

b. *The M/V Fir Grove* [5]

Delica Shipping S.A. ("Delica") is a Panamanian corporation and is the registered owner of the M/V Fir Grove. Inui Steamship, Ltd. ("Inui") is a Japanese corporation which acted as the operator of the Fir Grove. Delica and Inui are beneficially owned by the same Japanese investors. The Fir Grove is a Japanese based vessel designed as a log carrier and is registered in and flies the flag of the Republic of Vanuatu. Between January, 1989, and January 1990, the Fir Grove traveled back and forth under charter between Japan and the west coast of Canada and the United States. On each occasion it embarked from Japan without cargo, loaded a cargo of logs in Canadian and United States ports, and then returned to Japan to deliver logs to the charterer. During this timeframe, the Fir Grove completed six round trips between Japan and the Northwest Coast of North America.

Plaintiffs are fourteen Filipino nationals who were employed as seamen aboard the Fir Grove. Defendants agree that the Fir Grove was an FOC vessel and that one purpose of FOC shipping is to reduce labor costs by enabling vessel owners from industrialized nations to employ seamen from third world countries.

Western Shipping Agency, Inc. ("Western–Manila") is a Philippine corporation and is a manning agency located in Manila, Republic of the Philippines. Noimi Zabala is the president of Western–Manila. Zabala recruited all plaintiffs to serve on board the Fir Grove for twelve calendar months. Each plaintiff signed an individual employment contract (IEC) at the office of Western–Manila on or about January 9, 1989, which showed Western Shipping Co., Ltd. ("Western–Tokyo") as the "employer." [6] Although a factual dispute exists as to whether the wage amount was written into the contract at the time the IECs were signed, they were completed with reference to the POEA minimum wage rate prior to submission to the POEA for approval on January 12, 1989. The POEA minimum wage for an able-bodied seaman (AB) at the time these manning agreements were executed was $276 per month. However, irrespective of when the POEA rate was inserted into the IEC, plaintiffs testified that they knew from prior experience aboard Inui vessels, or were told orally by Zabala, that they would be paid $220 per month for their home allotment and $90 for their on board cash allotment in accordance with the Western Shipping pay scale. The exit visas ultimately issued to the seamen referenced the POEA minimum wage and not the Western Shipping scale actually paid.

In addition to the base wage rate and onboard cash payment, Zabala and his agents told plaintiffs that they would receive a $60 cash "ITF bonus." Zabala and the plaintiffs testified that the payment was in ex-

---

5. For the purposes of the "background" section, I have relied only upon those facts to which all parties agree or concede.

6. Western–Tokyo, through its agent Mr. Kikushima, later became known as Yeh Shipping.

change for plaintiffs' promise that, if they were stopped by an ITF inspector, they would display an ITF worldwide wage scale and falsely report to the ITF inspector that they were being paid ITF worldwide wage rate wages. Defendants concede that Western–Manila, through Zabala, was contemporaneously engaged in the alternative "ITF program" to deliberately circumvent the ITF blue certificate requirements. Each of the plaintiffs had been hired by Western–Manila and Zabala in the past and ten of them had previously participated in the ITF scheme.[7] This ITF bonus was a further incentive to go along with the ruse.

Thus, prior to leaving the Philippines to board the Fir Grove, the following base wage rates for an AB seaman were utilized by Zabala in the course of recruiting and hiring plaintiffs: (1) the Western Shipping pay scale of $220 which was the amount actually paid to plaintiffs; (2) the POEA minimum wage referenced in the IEC of $276; and (3) the ITF worldwide wage rate which was $821 per month at that time.

After the seamen arrived on board the Fir Grove in Onishi, Japan, Chief Officer Perfecto Lim instructed them that, if asked by an ITF inspector, they were to say that they were being paid at the ITF rate. Plaintiffs were given copies of the ITF worldwide wage scale by Chief Officer Lim so that they could show it to the inspectors and confirm that it "accurately" reflected their pay. In return for their participation in the scheme, plaintiffs received the "ITF bonus" of approximately $60.

Further, when plaintiffs boarded the Fir Grove in Japan, Chief Officer Lim placed the shipping articles in the crew mess area. The articles outline the rights and duties of the master and seamen. At paragraph 16, the following provision was typed into the form contract:

"It is agreed that the wages and employment conditions of all seafarers serving on board the above vessel **shall be governed by the terms of the current I.T.F.**

**Collective Agreement attached below with effect from January 25, 1989.** The owners also agree that, despite whatever may be printed or written in these Articles now or hereafter, signature on these Articles by any seafarer at the time of discharge from the ship shall not amount to a release of the owners and or the vessel from any claim for wages or any other claim of the seafarer which is outstanding at discharge, and receipt of wages at discharge shall not be treated as full and final settlement of all outstanding wages."

Each member of the crew signed the inside roll sheet of the articles but could not recall having seen the cover page. The crew roll contains columns for the seaman's name, embarkation date, salary, discharge date and signature. The salary column was blank when the seamen signed the articles.[8]

In February and March of 1989, plaintiffs signed two different payroll sheets reflecting receipt of wages under a double bookkeeping program. One showed receipt for the wages actually received ($220 home allotment for an AB and $90 shipboard cash), and one showed the ITF worldwide rate ($821 for an AB). Neither receipt referenced the POEA minimum wage rate contained in the IEC manning agreements. After March of 1989, the double booking practice was discontinued and plaintiffs were issued a single wage receipt which reflected the Western Shipping pay scale rate actually received.

When the voyage of the Fir Grove was well underway, Zabala began the process of "negotiating" a CBA with AMOSUP for the Fir Grove. Accordingly Zabala, at the request of Kikushima, called upon his friend, Captain Oca of AMOSUP, who sent over six copies of the AMOSUP CBA containing the AMOSUP minimum wage for an AB of $500 per month as referenced in Annex A to the AMOSUP CBA. Zabala signed each copy, without reading them,

---

7. *See* exhibit 213 for a summary of plaintiffs' ITF Employment history. Only Nianga, Coyoca, Pagente and Calibjo had had no prior direct experience with Western–Manila's ITF scheme.

8. Neither the ITF CBA nor the ITF wage scale distributed to the crew members were "attached below" as indicated at paragraph 16 of the shipboard articles.

and sent them to the ITF in London along with a check for membership dues. Zabala testified that he had no intention of paying plaintiffs the wage rates set forth in the AMOSUP CBA and that the sole reason for "negotiating" the contract was to obtain a blue certificate from the ITF. The agreement was "executed" between Yeh Shipping and AMOSUP on April 7, 1989, and was purportedly made effective "as of February 1, 1989" with a proposed date of termination of January 31, 1990. The parties agree that none of the plaintiffs are, or were, members of AMOSUP nor did any plaintiff have knowledge of, or participate in the AMOSUP CBA "negotiation."

On November 4, 1989, Edwin Jose was injured at sea on the Japan to British Columbia leg of the vessel's sixth scheduled round trip. He was landed at Adak, Alaska for medical care on November 6, 1989. While in Alaska, Jose met with a representative of the Seaman's Church who introduced him to Mr. Dodson, plaintiffs' attorney. After consulting with Dodson, Jose traveled to Coos Bay, Oregon where the Fir Grove was docked in preparation for the last leg of its seventh and final round trip voyage under the seamen's contracts. Twelve of the 21 crew members, including Jose, decided to institute the present action and seek back wages under the ITF rate of pay referenced in the shipping articles.

On January 21, 1990, at the request of Mr. Dodson, John Sansone, an ITF inspector, boarded the Fir Grove in Coos Bay. In his deposition, Sansone explained that he boarded the vessel and asked the master to show him the vessel's blue certificate and shipping articles. When Sansone reviewed the shipping articles with the ship's master, Captain Kanemoto,[9] he discovered that the wage columns were blank he directed the master as follows:

"I said, 'captain, the column from—where the basic wages go is blank.' I said, 'of course, that is unacceptable. Whatever the seamen are getting paid, you have to enter into this column what you are paying them.' And then at that time he [Kanemoto] held up the worldwide agreement wages and it is on a sheet of paper. And he had the sheet of paper and he held it in front of me. I said, 'well, whatever the seamen are making,' I said, 'you have to enter that into the basic wage column.'"

Sansone Depo., at pp. 43–46.[10] Kanemoto then proceeded to fill in the wage columns with the ITF worldwide wage rate.[11] Thus, if the ITF worldwide rates written into the shipping articles by the Captain applied, plaintiffs should have received the following monthly wages: Jose, Mejarito, Penetrante, Santos, Dagcuta (ABs and oilers): $821; Conejar (a radio officer): $1430; Daug (a first engineer): $1786; Pagaduan, Nianga & Calibjo (ord. seamen, wiper): $611; Torreliza (a chief cook): $917; Osorio & Coyoca (second officer): $1430; Pagente (third engineer): $1378.

On February 2, 1990, all plaintiffs, except Jose were repatriated to the Philippines. Jose has remained in this country under a medical visa and continues to undergo physical therapy. None of the plaintiffs have obtained employment since their discharge.

The foregoing background illustrates that the facts in this case follow the historical "paradigm" set forth by Chapman and Professor Northrup significantly. Thus, to the extent that I may question the credibility of certain witnesses or assess the validity of evidence, I find that I may rely upon

---

**9.** Captain Kanemoto replaced the Fir Grove's original master, Captain Fukuoka on October 17, 1989.

**10.** I have quoted this passage from Mr. Sansone's deposition verbatim in light of defendants' mischaracterization of Sansone's testimony. For example, in their proposed findings, defendants proffer that the master "wrote the wages in, using the ITF wage scale ... at the direction of Sansone." Although the deposition

colloquy reveals that this is what defendants' counsel *wanted* Sansone to say, the inspector's testimony is to the contrary.

**11.** Defendants do not dispute that the "master" is the agent of the owner and can bind his principal by acts performed within the scope of his agency. *See* Norris, § 25:1; and *Coastal Iron Works, Inc. v. Petty Ray Geophysical Div. of Genosource, Inc.,* 783 F.2d 577 (5th Cir.1986).

the historical industry background to corroborate or complement the evidence.

### c. *Pleading Background*

Twelve plaintiffs filed their first complaint for back wages and penalties in this case on January 23, 1990 and the FIR GROVE was arrested by U.S. Marshals in the Port of Coos Bay on January 24, 1992.[12] On January 31, 1990, defendants tendered to those twelve plaintiffs, under a reservation of right, $299,431 in claimed back wages computed under the ITF worldwide wage scale rate. On January 31, 1990, plaintiffs filed their first amended complaint and Asher Nianga and Victor Torreliza, two individual plaintiffs were added. In addition, 152 non-FIR GROVE seafarers and five seafarers represented by AMOSUP were named as additional plaintiffs.

At a bond hearing on February 2, 1990, Magistrate Judge Juba set a bond of $10.6 million based upon the claims of the original 12 plaintiffs only. He found that this court lacked subject matter jurisdiction over the 152 non-FIR GROVE seamen and made no findings as to the additional two plaintiffs or the five FIR GROVE—AMOSUP plaintiffs.[13] Defendants filed objections to Judge Juba's order and two hearings were conducted before me on February 7 and 9, 1990. At these hearings, I held that plaintiffs' claims for penalty wages were tolled upon payment of past due wages and reduced the bond to $3.5 million to cover claimed back wages of seven new plaintiffs, accrued penalties computed up to January 19, 1990 and antic-

ipated general costs through litigation.[14] In addition, I adopted that portion of Judge Juba's order which found that this court lacked subject matter jurisdiction over the 152 non-FIR GROVE seafarers. The FIR GROVE was released upon posting of the bond on February 9, 1990.

On February 13, 1990, plaintiffs filed their second amended complaint which reasserted the original claims and included claims for back wages and penalties for the 152 non-FIR GROVE seamen and the "AMOSUP 5." Shortly thereafter, two separate "third amended" complaints were filed. Mr. Dodson filed a third amended complaint on behalf of the original twelve plaintiffs and Nianga and Torreliza on June 28, 1990. Stephen Koslow filed a third amended complaint which deleted reference to the original twelve seamen, Nianga and Torreliza, and which purported to be filed by AMOSUP "on behalf of" Lim, Esclamado, Napao, Roales and Pinoon. At a conference on July 30, 1990, I informed Mr. Koslow that his proposed separate third amended complaint was not appropriate and directed him to file a complaint in intervention.

After several months of sorting out the bond issues, establishing who the plaintiffs were and which group of plaintiffs was represented by which counsel, we embarked upon a series of motions to dismiss all parties on various grounds and for various reasons. On May 21, 1990, I dismissed AMOSUP's claims from this action for lack of subject matter jurisdiction.[15]

---

**12.** The "original" twelve plaintiffs are Edwin Jose, Orlando Osorio, Ascension Conejar, Romulo Mejarito, Clemente Pagaduan, Antero Daug, Nicholas Coyoca, Carmelo Pagent, Danilo Penetrante, Alberto Dagcuta, Basilio Santos and Goven Calibjo.

**13.** The "AMOSUP 5" consisted of Perfecto Lim, Buen Esclamado, Crescensio Napao, Tomas Roales, and Hermiles Pinoon.

**14.** In the related case of *Raby v. M/V PINE FOREST,* 918 F.2d 80, 81 (9th Cir.1990), *cert. denied* — U.S. ——, 111 S.Ct. 2015, 114 L.Ed.2d 101 (1991), the court held that penalty wages accrued up to the date of a tender of back wages need not themselves be tendered to preclude accrual of further penalties. *See also Merrick v.*

*Sea-Land Service, Inc.,* 739 F.2d 126, 130 (3rd Cir.1984) ("That heaping of a penalty on a penalty ... like the attempt of two ancient Greeks to pile Pilion upon Ossa in the attempt to reach Olympus ... will not work.")

**15.** The history of AMOSUP's representation and participation in this case is set forth in some detail in my Opinion of June 29, 1990, and my order of January 15, 1991. My original order of dismissal was based upon AMOSUP's failure to appear and respond to defendants' motion to dismiss. My subsequent affirmations of that initial order were based, in part, upon AMOSUP's counsel's failure to come forward with any reasons for their failure to respond to the motions, and more importantly, upon my finding that AMOSUP was not a proper party under 46

On August 13, 1990, I issued an opinion on defendants' motion for partial summary judgment on the jurisdiction of this court to award penalty wages under 46 U.S.C. § 10313. 1990 WL 302728. I granted the motion as to penalties upon wages accrued between the arrest of the vessel and the "discharge" of the plaintiffs from the vessel at the Port of Coos Bay on February 2, 1990, based upon my finding that any withholding was due to a misunderstanding between counsel. I denied the motion against plaintiffs' claims for penalties accruing up to January 19, 1990, finding that "plaintiffs' claims meet the jurisdiction prerequisite as set forth in § 10313(f)(g) and (i)." Opinion at 9. Although I referred to the fact that plaintiffs' claims were for noncompliance with the wage provisions in the shipping articles, I did not address how penalties might be awarded. Rather, my decision at that time was limited to determining that the statute applied to foreign plaintiffs aboard foreign vessels when they are discharged from their employment aboard the vessel in a U.S. port.[16]

On October 11, 1990, I denied defendants' motion for reconsideration of my August decision on the applicability of § 10313 to plaintiffs' claims. Again, although I discussed some of the facts relative to plaintiffs' arguments on when payments were due, I noted that "whether plaintiffs are entitled to recover penalties under the facts present in this case has yet to be decided." 765 F.Supp. 1015 at 1018. In addition, I held that plaintiffs' claims for

blacklisting did not fall within the court's admiralty jurisdiction since any harm they may suffer as a result of the notations in their seamen books would occur on land (in the Philippines) when they attempted to seek future employment. I found, however, that I could exercise pendent jurisdiction over plaintiffs' common law claims since they arose out of a "common nucleus" of facts with the wage claims. Finally, I granted defendants' motion for partial summary judgment against plaintiffs' claims for fraud based upon representations by the defendants that plaintiffs would be paid according to the ITF worldwide rate referenced in the shipping articles. Based upon my review of plaintiffs' deposition testimony, I found that each plaintiff was orally informed at the time he signed his IEC that he would not receive ITF wages, but was to tell any ITF inspectors who boarded the vessel that he received ITF wages and to display the ITF wage scale:

"I find that all of the evidence in the record indicates that plaintiffs were willing participants in this unfortunate scheme obviously designed to cut costs at the seamen's expense. However, as offensive and unethical as these alleged practices may seem, and although other remedies may be available, they may not be used to support a claim of common law fraud."

*Id.* at 1023.[17]

Following my October 1990 Opinion, defendants filed a second motion to dismiss

U.S.C. § 10313. AMOSUP's rights and claims in this action derived from a collective bargaining agreement executed in the Philippines between AMOSUP and the Japanese owners of the FIR GROVE. The CBA contained a forum selection clause which required that all disputes be brought for judicial resolution at Manila, Philippines.

**16.** *See also Barcelona v. Sea Victory Maritime,* 1991 WL 323803, *4 n. 4 (E.D.La.1991), in which the court relied upon my holding in the related case of *Su v. M/V Southern Aster,* 767 F.Supp. 205 (D.Or.1990) in granting the plaintiffs' motion to remand the action to a state court. The court found that because plaintiffs had not been "discharged" in a U.S. harbor, § 10313 was not triggered for the purpose of establishing federal jurisdiction.

**17.** As plaintiffs' counsel pointed out during trial, my use of the phrase "willing participants" may have been misleading. As I learned at trial, unemployment in the Philippines is around 50% and jobs on board vessels are extremely competitive. As a consequence, and as discussed further, *infra,* employment contracts for seafarers in the Philippines are hardly "negotiated" in the sense that we are familiar with in this country. It is clearly an employer's market and coercion existed as a result of economic forces in that country. In clarification, my finding of plaintiffs' "willingness" to participate in this scheme was based upon the lack of any evidence that these defendants directly coerced or threatened plaintiffs' participation—this is not a case of shanghai. However, my choice of phraseology should not give rise to an inference that plaintiffs had any choice over how they might partic-

plaintiffs' blacklisting claims on the basis that Philippine law provides that exclusive remedy for all claims arising out of the employer-employee relationship and arguing that plaintiffs failed to show that their wage claims were brought in "good faith." Defendants filed a separate motion to dismiss the Joses' personal injury claims and raised the issue of *forum non conveniens* as to all claims. At the same time, plaintiffs filed a motion for summary judgment contending that the contract as set forth in the shipping articles should apply to their wage claims. On February 8, 1991, I held that the law of the Philippines should apply to all of plaintiffs' pendent claims, I reserved ruling on the law to apply to plaintiffs' claims for back wages until the factual issues regarding the governing contract could be resolved [18], I found that plaintiffs' wage claims were brought in "good faith," and I found that plaintiffs' interests in maintaining a single action outweighed any public interests the Philippines would have in resolution of these disputes.

On March 29, 1991, I issued an opinion and order on the parties' cross-motions addressing whether the trial should be to the jury or to the court. I found that plaintiffs invoked this court's admiralty jurisdiction and, by making this election, waived their right to a jury trial.

On May 24, 1991, plaintiff sought an extension of all deadlines to complete additional discovery in the Philippines and Japan and leave to file a Fifth Amended complaint in order to add two additional foreign defendants and to supplement the pretrial order. I granted plaintiffs' requests and directed the parties to address the impact of plaintiffs' proposed expansion on the issue of pendent jurisdiction under the *forum non conveniens* analysis set forth in my previous opinions.

On October 15, 1991, I issued an opinion granting defendants' renewed motion to dismiss plaintiffs' pendent claims under the doctrine of *forum non conveniens* in light of the significant public and private interest factors which weighed in favor of proceeding in the Philippines. In addition, I dismissed plaintiffs' claims under the U.S. RICO statutes, 18 U.S.C. § 1961, *et seq,* finding that RICO does not extend to the extraterritorial activities challenged in this case.

## II. FINDINGS AND CONCLUSIONS

### a. *Choice of Law and Contract*

■ The first factual dispute that I must resolve in this case is which contract if any, among the three (and arguably four) possible "agreements" produced in this case, governs the employment relationship of the parties. I will discuss each of these "contracts" in turn.

#### (1) The IEC "Manila Contracts" & Western's Pay Scale

The manning contracts signed by the plaintiffs in Manila with Zabala and his agent, Alberto Aguilar, called for a base wage rate of $276 for an AB as required by the POEA wage scales.[19] Although Zabala and Aguilar claimed that all details regarding plaintiffs' wages were contained within the contract at the time they were signed by the plaintiffs, I find their testimony lacks credibility. In particular, Zabala testified to freely and willfully engaging in a scheme to defraud the ITF at the expense of some 300 seamen he purports to represent in Manila. Although his account of what he told Captain Oca and what Captain Oca may or may not have known about the viability of the AMOSUP CBAs changed at

---

ipate in this particular program or that they enjoyed any significant benefits from the scheme. At trial it became clear that these plaintiffs would have accepted any job on any terms just to have the opportunity to work and support their families.

**18.** In making this determination, I rejected plaintiffs' contention that defendants should be collaterally estopped from denying that the wage claims were governed by the terms found

in the shipping articles based upon Judge Tanner's finding in *Raby v. M/V Pine Forest.* 765 F.Supp. 1024 at 1036.

**19.** Although Zabala's status as an "agent" for defendants was not disputed at trial, I do find that he acted as their agent and was working within the scope of his authority when he recruited plaintiffs for work aboard the Fir Grove.

trial, I find that Mr. Zabala has amply demonstrated that he has and will recount whatever version of events suits the circumstance of the moment. Furthermore, the testimony of Zabala's agents and of other seafarers, such as Chief Officer Lim, is also suspect in that it was very clear that these witnesses were under the same pressure to support the company line as plaintiffs were during their period of employment. That is, their testimony was influenced by their need or desire to continue their employment with or through Zabala. Thus, I question whether the IECs entered into by the plaintiffs in Manila are valid in that they may have lacked the basic terms required of such agreements, such as the term of employment and the rate of pay. *See Local 3–7, International Woodworkers of America v. Daw Forest Products Co.*, 833 F.2d 789, 792–3 (9th Cir.1987) (employment contract must contain essential terms to be enforceable).

However, even if I were to find that the Manila contracts were completed by the insertion of a wage figure, I still question their validity since Mr. Aguilar testified that they typed in that figure solely "for POEA purposes." He admitted that Jose wasn't paid that amount because they "couldn't afford" that amount. Mr. Jose confirmed that his base pay rate was in fact $220, rather than $276. Thus, by defendants' own admission (through the testimony of Mr. Aguilar) the $276 figure written into Mr. Jose's contract was inaccurate. The POEA (theoretically) would not have allowed Mr. Jose to leave the country to work aboard the Fir Grove had his actual base pay rate of $220 been included within the manning agreement.

Defendants' argument that the rates reflected in the Western Pay scale should be enforced because that is what all of the parties expected is without merit or support in the law. First, those rates are not reflected in any contract before this court. Second, there is ample evidence in the record to demonstrate to me that any "agreements" between plaintiffs and Mr. Zabala or his agents were contracts of adhesion. Clearly, plaintiffs were willing to accept employment on any terms—they did not read what they signed, but rather accepted and consistently signed whatever Mr. Zabala or his agents put before them. If they wanted to work they had to accept Zabala's terms—take it or leave it. This is precisely the type of activity sought to be avoided by the general principles of maritime law which require the execution, signing, and carrying of completed shipboard articles. See further discussion, *infra*.

(2) The AMOSUP CBA

Neither plaintiffs nor defendants contend that the AMOSUP CBA should be the operative contract. However, defendants argue that the "ITF rate" referenced on the cover page of the shipping articles actually refers to the AMOSUP collective bargaining wage of $500/month (for an AB) rather than the worldwide rate of $821/month. Even if I could set aside my consideration of Mr. Zabala's testimony as to how this CBA was "negotiated" with Captain Oca, general maritime law clearly disfavors any contracts entered into while the ship is at sea. Norris, § 6.4. Many courts have found articles executed at sea per se invalid as executed under inherently coercive conditions. *Id.* (citations therein). Thus, even if plaintiffs had been involved in the "negotiating" process, reliance upon a CBA which was not executed until approximately 3 months after the Fir Grove set sail would be prohibited under general maritime law.

(3) The Shipping Articles

 I preface my analysis of the shipping articles with the basic understanding, agreed upon by the parties, that well established law directs that the basic terms of a seaman's employment contract are set out in the shipboard articles signed at the outset of a voyage. *Young v. Steamship Co.*, 105 U.S. 41, 26 L.Ed. 966 (1882); 1 M. Norris *The Law of Seamen* (4th ed. 1985) § 6.1 ("The shipping article is the contract of employment between the master and the seamen.") Written shipping articles are required under the laws of Vanuatu and must, at a minimum, set forth the period of engagement, the terms of shipment and the

rate of pay for each seaman. *See* Chapter 11 of the Vanuatu Maritime Act, § 107 (plaintiffs' exhibit 19); *see also* ILO Convention No. 22, Articles No. 3, 5 & 6 (1926).[20] Further, the articles must be signed by the seamen prior to departure of the vessel from the port at which the seamen joined the vessel. Vanuatu Maritime Regulations, 1981 (as amended) § 37.

The rationale underlying this general rule of construction is manifest—the law is designed to protect seamen from "harsh treatment and deception" by the master while seamen are in a position of relatively little power at sea. *Sylvis v. Rouge Steel Co.*, 873 F.2d 122, 125 (6th Cir.1989). Seafarers have consistently been given special status as "wards" of the court and their wages are construed as "sacred liens." *See generally Castillo v. Spiliada*, 937 F.2d 240, 243 (5th Cir.1991). Further, any alteration of the articles is to be construed against the shipowner "on the theory that the articles are in the custody of the ship ... and that masters and owners have the means and facilities for putting their contracts with seamen in plain and unambiguous language. Norris, § 6.6, at p. 181.

Based on the foregoing, I find that the shipping articles constitute only valid contract, if any in this case, and that the rate referenced in the shipping articles is the operative rate of pay owed to the Fir Grove seafarers.

b. *Penalties*

(1) Extraterritorial Concerns

■ Defendants' primary and longstanding argument against the application of the wage provision of the U.S. Shipping Act to the facts and defendants in this case is based upon the extraterritorial limitations of U.S. authority. As I noted in my opinion of October 15, 1991, extraterritorial application of a federal statute is a matter of statutory interpretation. *EEOC v. Arabian American Oil Co.*, — U.S. —, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (Court defined its task as determining whether Congress intended the protection of Title VII to apply to U.S. citizens employed abroad); *Windward Shipping (London) Ltd. v. American Radio Ass.*, 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974) (application of NLRA to unions picketing foreign ships) and *Cruz v. Chesapeake Shipping*, 932 F.2d 218, 224–226 (3rd Cir.1991) (in determining whether FLSA applied to Filipino seamen employed on reflagged Kuwaiti tankers, court found Congress failed to evince an intent to expand traditional scope of "affecting commerce" language).

In *EEOC*, the Court held that Title VII of the Civil Rights Act of 1964 did not apply to a United States Citizen employed abroad by American employers. The Court began its inquiry by noting the "long standing principle of American law" that Congressional legislation is presumed to apply only within the territorial jurisdiction of the United States unless a contrary intent is "clearly expressed." *Id.*, — U.S. at —, 111 S.Ct. at 1230. The Court found that, although Congress used broad language by providing for civil liability against employers who "engage in an industry affecting commerce," it did not clearly disclose an intention to give Title VII extraterritorial effect. *EEOC*, at —, 111 S.Ct. at 1232. In support of this conclusion, the Court also noted the following factors: (1) Title VII fails to provide any mechanisms for overseas enforcement, such as rules governing foreign service of process; (2) the statute provides geographically limited venue and investigative authority; and (3) Congress failed to address the subject of conflict with foreign laws and procedures. *Id.*, at —, 111 S.Ct. at 1234; *Smith v. United States*, 953 F.2d 1116 (9th Cir.1991) (declining to apply FTCA, in part, on basis that its venue provisions are "ill-suited" to extraterritorial application).

Even in the areas of U.S. law where it is well established that extraterritorial application of U.S. laws is permissible, courts have embraced a cautious approach. In

---

**20.** The International Labor Organization, "ILO" is a United Nations Related Agency concerned with labor problems in the shipping industry. See generally, Chapman at pp. 5–6.

*Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir.1976) *Timberlane I*, the Ninth Circuit emphasized that, although American law covers some conduct which takes place beyond U.S. borders, the concerns of other nations and respect for their interests must be a factor the court considers prior to any decision to exercise jurisdiction: "[i]t is evident that at some point the interests of the United States are too weak and the foreign harmony incentive for restraint too strong to justify an extraterritorial assertion of jurisdiction." 549 F.2d at 609–612.[21]

Thus, the primary focus of my inquiry is Congressional intent: did Congress intend that the U.S. wage provisions of the Shipping Codes should be applied extraterritorially to foreign defendants based upon claims of foreign plaintiffs, and if so, in what circumstances and with what, if any, limitations. Defendants rely upon *EEOC* and its predecessors in support of their contention that application of the penalty wage provision to this case would offend the Supreme Court's rule against the application of U.S. laws to foreign entities in the absence of an express manifestation from Congress to do so. Defendants argue that to do otherwise would result in the impermissible meddling of U.S. courts into the labor affairs of foreign countries.

Here, unlike Title VII, the Securities and Exchange Act and RICO, the U.S. Shipping statute expressly applies to foreign vessels when "in a harbor of the United States." As Justice Brandeis noted in *Strathearn*, Congress designed the Act to affect foreign shipping at least insofar as it related to the payment of wages upon discharge. The reasons and rationale remain sound today—once a ship has entered a U.S. harbor and a seaman is "discharged" from the ship, he must be paid all wages due within five days. The interests of the U.S. in enforcing such a provision, even in the context of foreign parties and a foreign labor contract, is clear—Congress did not want foreign seamen to be stranded in our ports without funds to support themselves.

Defendants' well-founded concerns of the potential over-reaching of U.S. policy into foreign labor concerns is tempered by the jurisdictional limits placed within the statute itself. First, the statute's substantive scope is limited to the enforcement of wages due and does not prescribe *what* wages should be due or when those wages should be due up until the time of discharge. Second, the penalty provision of the Act does not apply to foreign seamen aboard foreign vessels unless and *until* there is a discharge of a seaman in a U.S. harbor. *I Hyeon Su v. M/V Southern Aster*, 767 F.Supp. 205, 1990 AMC 1217 (D.C.Or.1990). The statute's requirement that discharge take place in a U.S. port reflects the rule of international maritime law that "the internal economy and management of a vessel should normally be controlled by the law of the flag." *Cubeiro v. Sun Seaway Enterprises, Inc.*, 539 F.Supp. 1175, 1177 (S.D.N.Y.1982) (citations therein).

Thus, to the extent the plaintiffs seek redress for defendants' violations of the shipping articles beyond the claims for back wages, the forum for those disputes lies properly, and more appropriately, in the Philippines. Although defendants' practices may offend Western standards and clearly would not be tolerated under United States Labor Codes, any reform lies with the POEA as the body charged with

---

**21.** Thus, the court adopted a "tripartite" analysis for application of the Sherman Act to foreign defendants: first, there must be some effect, actual or intended, on American foreign commerce; second, plaintiff should make a greater showing of burden or restraint; and third, the interests of the U.S. must be sufficiently strong vis-a-vis those of other nations to justify an assertion of extraterritorial authority. *Id.*, at 613. The elements to be weighed in the third prong of this analysis include: (1) the degree of conflict with foreign law or policy; (2) the nationality or allegiance of the parties and the locations or principal places of business of corporations; (3) the extent to which enforcement by either state can be expected to achieve compliance; (4) the relative significance of effects on the U.S. as compared with those elsewhere; (5) the extent to which there is an explicit purpose to harm or affect American commerce; (6) the foreseeability of such effect; and (7) the relative importance to the violations charged of conduct within the U.S. as compared with conduct abroad. *Id.*, at 614.

**374**

the duty of protecting the rights of Philippine workers, and the cooperation of all nations within the international law forum. It is simply beyond the province of this court to determine the relative validity or soundness of policies enacted by the ITF, the Asian Trade Unions or the POEA.

#### (2) "Discharge"

■ Whether the contract had come to an end, or whether the vessel owner had anticipated that the crew would not be discharged and leave the vessel's employ until after returning to Japan to unload cargo is, I find, irrelevant.[22] In light of the express congressional policy discussed, *supra*, I find that the key to triggering the statutory requirement of a "discharge" is the cessation of the employment relationship in a U.S. harbor. *See The Mary*, 16 F.Cas. No. 9, 191, p. 946, 947 (D.Me.1838) (wages due from date "term of service is completed"); and *Mateo v. M/S KISO*, 805 F.Supp. 761, 781 (N.D.Cal.1991) ("end of voyage" for purposes of subsection 10313(f) occurred when plaintiffs were discharged from further employment).[23]

■ According to Norris, a "discharge" may be effected by arrest and seizure of the vessel, failure to pay one-half wages in port upon demand as required by § 10313(e), illness or injury, or by "operation of law" such as the complete fulfillment of the contract terms or where the seamen have been "shipped contrary to statutory provisions *and* leave the service (of the ship)." Norris, at § 21 (emphasis added).

In *Mateo v. M/S Kiso*, a similar action pending before Judge Jensen in the Northern District of California, the court addressed the differences between subsections (e) and (f) of section 10313. In his opinion of August 13, 1991 and November 19, 1991, Judge Jensen emphasized that subsection (e) applies only to demands made at intermediate ports "during" the voyage and that, in contrast, subsection (f) applies only to the payment due at the "end of a voyage" when the seamen are discharged from further employment. *See* August Opinion at p. 43–44; November Opinion at pp. 17–18. Unlike subsection (e), subsection (f) contains no "demand" requirement. Judge Jensen concluded that claims under these subsections are "distinct" and that penalty wages, as provided in 10313(g), are only available in the event of a violation of subsection (f) at the end of the seaman's employment. Opinion of November 19, 1991 at p. 18. I concur with his analysis and adopt it here. Thus, whether the plaintiffs in this case effectively "demanded" one-half wages is not relevant to the determination of whether penalties under subsection (g) would flow from the defendants' failure to pay upon those "demands," but would, arguably, be relevant to the issue of *when* plaintiffs were discharged for the purposes of triggering statutory penalties.

■ I also concur with Judge Jensen's findings regarding the requirements for an effective "demand" under subsection (e). As he noted, the Ninth Circuit has held that a seaman must make an "effective" demand to trigger the protection of subsection (e). Opinion of March 9, 1992 at p. 20, *citing Larkins v. Hudson Waterways Corp.*, 640 F.2d 997, 999–100 (9th Cir.1981). To be effective, such a demand must be "explicit." Opinion of November 19, 1991 at p. 8, *citing Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512 (11th Cir.1985) (11th Cir.1985); *Larkins*, 640 F.2d 997; and Norris, § 17.33. In *Mateo*, as in this case, the plaintiffs claimed that they made effective demand under 10313(e) by signing false pay receipts and that they could not make their demands more explicit due to economic duress. The court rejected these arguments:

---

22. In rejecting this argument, I make no finding relative to the parties' dispute over what constitutes a "voyage."

23. In holding that the termination of the employment relationship is the determinative "dis-

charge" to trigger statutory penalties and back wage claims, I am rejecting plaintiffs' argument that the statute was triggered with the discharge of "ballast" in a U.S. harbor. *Cf. Raby v. M/V Pine Forest*, 1990 AMC 2441 (W.D.Wash.1990).

"Although plaintiffs argue that the act of signing pay receipts for wages not received is the functional equivalent of an explicit demand for half wages, this argument is unpersuasive in light of the purpose of § 10313(e). The signing of the receipts for wages not received is not a clearly made demand for half wages sufficient to place the ship's master on notice of plaintiffs' claims.... The Court is also unwilling to create the exception to the demand requirement suggested by plaintiffs. Plaintiffs have offered no evidence of duress other than the economic duress that may have resulted from the alleged withholding of their wages. As such an economic duress argument could be made by virtually any seaman who has had wages improperly withheld, such an exception would eliminate the demand requirement of § 10313(e) altogether."

In this case, the testimony of the plaintiffs and Zabala demonstrated that plaintiffs had a well-founded fear that they would be terminated had they made a demand for one-half wages under § 10313(e). However, I find that this fear was not due to any pressure placed upon plaintiffs by the defendants or their agents, but rather by the dire economic conditions in the Philippines and the high unemployment rate. Although the demand requirement of 10313(e) might be avoided in certain circumstances on account of duress or coercion, I find such an exception inappropriate in this case given the absence of any evidence of direct coercion by these defendants or their agents particularly in light of plaintiffs' understanding of the ITF scheme.

Based upon the foregoing, I find that plaintiffs did not make an effective "demand" for wages as required by subsection (e) and thus, defendants' failure to pay full ITF wages upon execution of the double wage receipts, coupled with the fact that plaintiffs continued to perform services on board the vessel, did not constitute a "discharge" from employment.

■■■■■ In this case, I find that Edwin Jose's employment relationship with defendants was terminated when he was released from the vessel for medical treatment and that he was "discharged" at Adak, Alaska effectively on November 6, 1989. I further find that the remaining thirteen plaintiffs' employment relationship with defendants ended in the Port of Coos Bay. From the date the Fir Grove entered the harbor at Coos Bay, there were several events which could have "triggered" a discharge. However, I find that the "discharge" in this case occurred on January 24, 1990, with the arrest of the vessel in Coos Bay.[24]

### (3) How are Penalties to be Applied?

■■■ Plaintiffs satisfy the jurisdictional prerequisites for application of the act since they were not paid full wages as required by the shipping articles at the time they were discharged in a U.S. port. Therefore, I must now determine how the penalty wage statute applies. Plaintiffs seek double wages for all wages withheld dating back to February of 1989, and continuing each month thereafter, when defendants paid them less than the amounts specified in the ITF worldwide pay scale. Plaintiffs have proffered two alternative theories of recovery which are based upon the number of voyages the vessel made to the U.S. on the assumption that the Act was triggered each time the Fir Grove entered a U.S. harbor.[25] Defendants counter that, even if the jurisdictional prerequisites for application of the statute are met, any withholding was "with sufficient cause."

---

**24.** There is no evidence in the record of what services, if any, plaintiffs performed on board the vessel from the date of arrest to February 2, 1990 when plaintiffs actually left the vessel for repatriation to the Philippines. I note, however, that although defendants dispute the *amount* owed, they did not dispute that plaintiffs were entitled to recover back wages for the period up to February 2, 1990.

**25.** The first proffer is "tiered" seven times so that upon each entry into a U.S. port, back wages *and* penalties are computed and the new penalties are computed upon both figures. The second proffer is a single, straight line method of computation.

Plaintiffs' argument draws up the difficult issue, touched upon in my previous opinions, but not directly confronted up to now—that of the relationship between plaintiffs' rights to receive wages and plaintiffs' rights under § 10313(f). Plaintiffs had a contractual right to receive wages at the ITF worldwide pay scale. Those wages were to be paid on a monthly basis. Since defendants did not pay plaintiffs in accordance with the ITF worldwide wage scale while they were performing services on board the vessel, I conclude that plaintiffs have established a breach of contract. However, I have also found that subsection (f) of the statute confers upon the seamen in this case a right to all wages due and owing upon discharge from employment and that legislative history and extraterritorial constraints limit application of this section to the entry into a U.S. harbor.

Based upon these findings, I conclude that the statutory penalties in this case do not begin to run upon a breach of the employment contracts, but commence upon violation of § 10313(f). I find that there is no violation of subsection (f) until the plaintiffs are "discharged" and that plaintiffs were not "discharged" until their employment relationship ceased on November 6, 1989 for Jose and on January 24, 1990 for the remaining thirteen plaintiffs. Defendants tendered all back wages claimed to the original twelve plaintiffs on January 30, 1990. Under the five day requirement of 10313(f), this payment was one day late for eleven of the twelve original plaintiffs and 74 days late for Mr. Jose. The two additional plaintiffs, Torreliza and Nianga, were paid all claimed back wages on February 14, 1990, or 20 days after the five day requirement of 10313(f).

■ A second issue that arises with respect to penalties on back wages is plaintiffs' claim that, although defendants paid all wages sought under their initial computations, defendants failed to pay additional back wages for all fourteen plaintiffs of $1,100 on the balance of wages due to January 19, 1990; $4,435.00 for the balance of wages due for January 20, 1990—January

ary 23, 1990; and $11,088.00 for the period of January 24—February 2, 1990. Plaintiffs acknowledge this court's earlier ruling that any additional wages withheld during the period following the arrest of the vessel were with "sufficient cause" as a matter of law in light of counsels' misunderstanding, *see* Opinion of August 13, 1990 at p. 11, but argue that, as of the filing of their third amended complaint on June 28, 1990 which sets forth plaintiffs' corrected computations, any withholding beyond that date was "without sufficient cause," and hence, they are entitled to penalties from June 28, 1990 to the present.

(4) Without "Sufficient Cause?"

■ Once a seaman establishes a delay in the payment of wages, the burden of proof shifts to the master to show that the delay was justified. *Smith v. Western Offshore, Inc.,* 590 F.Supp. 670 (E.D.La.1984). As the statute recognizes, not every withholding of wages justifies the imposition of a penalty. A shipowner may avoid application of the penalty if there is "sufficient cause" for the withholding. "Without sufficient cause" has been characterized as conduct which is "arbitrary, unwarranted, unjust" or unreasonable. *Larkins,* 640 F.2d at 999; *Chretien v. Exxon Co., USA,* 863 F.2d 182 (1st Cir.1988); and Norris, at § 17.5 (citations therein). "Sufficient cause" has been found in instances where the wages were promptly paid, where the seamen refused to accept the wages offered at the time of discharge, in cases of desertion, or when there is an "honest" or "bona fide" uncertainty as to the meaning of the articles or the amounts due thereunder. *Vinieris v. Byzantine Maritime Corp.,* 731 F.2d 1061, 1063–64 (2nd Cir. 1984); Norris, at § 17.5–.19; *see also Marine Transport Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots,* 766 F.Supp. 1564 (M.D.Fla.1991) (computational errors may constitute sufficient cause).

Defendants contend that, even if the court finds that a balance of wages was due and that payment was withheld, they were justified in withholding wages based upon the "unique" circumstances in this

case and their good faith dispute that any wages were owing.

Based upon my review of all of the evidence in this case, which included double books, double wage receipts, false contracts and particularly based upon the testimony of the defendants' manning agents, I find that defendants willfully violated the terms of the shipping articles. I further find that evidence of the 1983 incident in which the Ken Forest, another Inui vessel, was stopped and full wages were demanded was relevant for the limited purpose of demonstrating that defendants knew that their "ITF program" was a violation of the shipping articles. Thus, I conclude that any delay in payment following the Fir Grove's arrest until the tender of plaintiffs' demand was "without sufficient cause." Accordingly, Edwin Jose is entitled to recover 74 days of penalties, Nianga and Torreliza are entitled to recover 20 days of penalties, and the eleven remaining plaintiffs are entitled to one day of penalty wages.

However, following the tender of plaintiffs' claimed back wages, I find that the dispute over the balance of wages owing was both bona fide and asserted in good faith by all parties as part of the litigation process. Evidence of defendants' good faith is revealed in their attempt to tender $2,294.48 in wages for the period up to February 2, 1990, although the tender was returned as unacceptable by plaintiffs' counsel. Further, I find that defendants could have reasonably relied upon my opinion of August 13, 1990, and refused to resubmit their tender on the assumption that my ruling would continue to apply to the withholding for that time period. Finally, I find that the initial error was computational rather than "willful" or arbitrary. I find that plaintiffs' revised computations for the period through February 2, 1990, are accurate and that plaintiffs are entitled to recover $16,623 in back wages. However, I deny plaintiffs' request for penalties on these sums.

### c. Attorney's Fees and Costs

In *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) the plaintiff seafarer sought damages for medical expenses and maintenance against the ship master. The Supreme Court held that counsel fees could be awarded under the admiralty court's equity powers where the defendant's "attitude and behavior had been callous ... willful and persistent" and had "forced plaintiff to hire a lawyer and go to court to get what was plainly owed him." *See also* Gilmore & Black, *Seamen and Maritime Workers,* at p. 312–314 (2nd ed. 1975). Thus, any award of counsel fees is similar to a punitive damage award and the standards for an award of punitive damages should apply. *See, Id.,* at 314; *see also Hines v. J.A. Laporte, Inc.,* 820 F.2d 1187, 1189 (11th Cir.1987) (both punitive damages and attorneys' fees may be awarded in appropriate circumstances).

The evidence at trial that I discussed more fully, *supra* in relation to the discussion of "sufficient cause," convinced me that defendants knew that they should have been paying plaintiffs the amounts stated in the shipping articles and that their failure to do so was motivated solely by economic concerns. Defendants might have had a "good faith" argument had they paid plaintiffs the wages agreed upon in the AMOSUP CBA, or even in the Manila POEA contracts, but they paid plaintiffs a base wage rate that fell well below even the lowest figure contained in these various "contracts." I find that defendants' actions were willful, and but for their attorney's intervention, their actions would have continued into the indefinite future. Furthermore, up until the last day of trial, plaintiffs were compelled to defend against a counterclaim for recovery of all back wages tendered after the arrest of the vessel in 1990.[26] When conducting a "cost-benefit" analysis with respect to their staffing operations in the future, defen-

**26.** On the last day of trial, defendants voluntarily withdrew their counterclaims. Defense counsel explained that the counterclaims were asserted for the primary purpose of maintaining consistency in their arguments regarding the applicable contracts and that defendants had never intended to actively pursue recovery of the back wages tendered.

**378**

dants may well reach the conclusion that it is actually far less expensive to operate with a single set of books and a single honest wage if they intend to call on American ports. Based upon the foregoing, I find that plaintiffs are entitled to the attorney fees and costs necessarily expended in prosecuting this action.

■ This brings up one final point. During trial, evidence was introduced that plaintiffs signed "letters of undertaking" with Mr. Zabala and his agents at Western–Manila at the same time that they signed their manning agreements. In these letters, plaintiffs agree that any recovery they may obtain in a legal proceeding will be forfeited to Western upon their return to the Philippines. Plaintiffs testified at trial that what they actually signed was a blank sheet of paper and thus, the text of the "letter" must have been filled in by someone else at a later date. Zabala and Aguilar denied this and testified that all documents signed by plaintiffs were filled in when signed and that all terms of the agreements were fully explained to plaintiffs upon the execution of the contracts. As noted previously, I find the testimony of Zabala and Aguilar incredible, and find that plaintiffs signed these "letters" in blank form.

But it really does not matter whether the letters were signed blank or with all terms well highlighted and explained since the purpose was to ensure that any seaman who rocked the boat would have to pay back anything he had gained through the legal process and circumvent the actions of any tribunal. Thus, the revelation of the existence of these letters is a significant concern. If these defendants are permitted to simply ignore the judgment of this court and reclaim the awards, then the very purpose of this proceeding is without meaning and the jurisdiction of this court is threatened. Accordingly, as part of my final judgment in this case and in the exercise of my equitable powers, I am ordering that each of the defendants, their agents (including Zabala and any of his agents), successors, or assigns are hereby prohibited from interfering with the judgment of this

court in any manner which includes any attempt to enforce the falsely obtained "letters of undertaking." Any violation of this directive will bring about civil sanctions which may include additional attorney's fees and costs expended by plaintiffs to protect and effectuate this judgment.

CONCLUSION

Based on the foregoing, I find that plaintiffs shall retain the $349,739.60 already tendered by defendants and are entitled to recover an additional $16,623 in back wages. In addition, plaintiff Edwin Jose is awarded 72 days in penalty wages, plaintiffs Torreliza and Nianga are awarded 20 days in penalty wages and the remaining eleven plaintiffs are each awarded one day's penalty wages. Plaintiffs are entitled to recover attorney's fees and costs and plaintiffs counsel shall submit a detailed fee petition within thirty days of the issuance of this opinion. Finally, defendants are enjoined from interfering or attempting to interfere with the judgment of this court, either directly or indirectly. Any violation of this directive will result in further hearings to consider the imposition of civil penalties which may include additional attorneys' fees or costs.